STATE OF CONNECTICUT *v.* TROY ARTIS
(AC 32048)

Lavine, Bishop and Peters, Js.

Argued October 12, 2011—officially released July 10, 2012

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anthony Bochicchio*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Troy Artis, appeals from the judgment of conviction, rendered after a jury trial, of accessory to assault in the first degree by means of a dangerous instrument in violation of General Statutes §§ 53a-8 and 53a-59 (a) (1). On appeal, the defendant claims that the trial court (1) improperly denied his postverdict motion for a judgment of acquittal on the ground of insufficient evidence and (2) abused its discretion by denying his motion to suppress.[1] We reverse the judgment of the trial court.

Based on the correctly and incorrectly admitted evidence, the jury reasonably could have found the following facts. At approximately 11 p.m. on February 14, 2008, the victim, Alexis Otero, drove some of his friends to Club Blu on Ann Street in Hartford where he was sometimes employed as a bouncer. Approximately half

---

[1] Prior to oral argument in this court, the defendant withdrew his claim that the trial court abused its discretion by denying his motion for rectification in which he had asked that the record reflect that he has four gold front teeth.

an hour later, Otero walked two blocks from Club Blu to Club NV near the corner of Allyn and High Streets.

On the same evening, Christina Miano also went to Club NV together with her then boyfriend, Robert Acevedo,[2] and his sister, Anna Acevedo, and Anna's boyfriend, the defendant. Robert Acevedo drove the four of them to Hartford in his silver Infiniti automobile. At approximately 11 p.m., as the four walked toward Club NV, the defendant, who carried a knife on his belt, asked Robert Acevedo for the keys to the Infiniti so he could put his knife in the automobile before undergoing a security check at Club NV. Miano and Anna Acevedo went on ahead to Club NV, where they socialized apart from the defendant and Robert Acevedo.

Near closing time, Otero, who knew Miano, visited with her for several minutes. At the time, he did not know that Miano had arrived with Robert Acevedo, whom he did not know. Otero routinely photographed people at nightclubs for a radio station website, and that night he took a photograph of Miano and Anna Acevedo.[3]

At closing time, Otero left Club NV to return to Club Blu. Miano left Club NV at approximately the same time and got into the Infiniti with Robert Acevedo and Anna Acevedo. She sat in the front seat next to Robert Acevedo as the three, uncertain of the defendant's whereabouts, waited for him to join them. Miano saw Otero and beckoned for him to come speak with her, which he did. Once the conversation was over, as Otero crossed High Street on his way to Club Blu, Robert Acevedo drove the Infiniti straight toward him. Otero jumped onto the sidewalk and yelled an obscenity at

---

[2] Miano testified that Robert Acevedo's nickname or street name is Hershey. Otero, on the other hand, was under the impression that Hershey was the defendant's street name.

[3] The photograph was admitted into evidence.

Robert Acevedo, who apologized. According to Miano, Robert Acevedo thought that Otero had "disrespect[ed]" him by talking with her.

Shortly thereafter, the defendant opened the rear passenger door of the Infiniti from the outside, entered the automobile briefly and quickly exited to confront Otero. The defendant and Otero exchanged profanities, and the defendant then punched Otero in the face and shoulder as the two men engaged in a face-to-face fistfight that lasted somewhere between two and ten seconds. Seconds after the fistfight commenced, Robert Acevedo and Anna Acevedo got out of the Infiniti and approached the defendant and Otero. Otero was then struck from behind, causing him to fall to the sidewalk. While he was on the sidewalk, Otero was on all fours covering his head. For approximately ten to twenty seconds, he felt three or four people assault him from different directions. Miano got out of the automobile when she saw Robert Acevedo, Anna Acevedo and the defendant all crowded around Otero while he was on the ground; Miano was unsure as to what they were doing. Miano then "grabbed Anna off" Otero, and the two women began to argue. During the assault on Otero, Miano did not see a weapon or a knife. At some point, she dropped her cell phone.

As Hector Robles, a Hartford police officer, walked toward the group of people surrounding Otero, others on the street called out, "cops . . . ." The fight broke up and the crowd dispersed.[4] The defendant, Miano, Robert Acevedo and Anna Acevedo got into the Infiniti and drove away. Anna Acevedo continued to express displeasure with Miano and wanted to fight her.[5] Robert

---

[4] In his report, Robles noted that two of the participants were dressed in red minidresses. The photograph that Otero took of Miano and Anna Acevedo reveals that the two women were wearing red minidresses.

[5] Miano testified that when she got into the Infiniti, Anna Acevedo stated: "I'm gonna beat your blank when we get out of the car."

Acevedo instructed the two women to stop, and he took Miano to her mother's home in order to separate the two women. According to Miano, while they were driving from the scene, Anna Acevedo asked the defendant, "where'd that blood come from?" Miano stated that she never looked at the defendant again after he got back into the automobile.[6] Later, another police officer found blood splattered on the sidewalk.

When Otero got up from the sidewalk, the Infiniti was gone. He saw a cell phone and put it in his pocket. He also saw that his hand was bleeding heavily. He walked to Club Blu where he knew he would find a police officer and familiar people to help him. Jessie Rego, who was working at the door of Club Blu, observed that the cut in Otero's thumb was so deep that he could see the bone. Rego also saw blood coming from Otero's stomach. A police officer found a trail of blood between Club NV and Club Blu.

Otero was transported by ambulance to Hartford Hospital (hospital). Although Otero has no recollection of being transported to or arriving at the hospital, he remembers going into an operating room, where he was treated for seven puncture wounds to his torso, arms and hand. Twenty sutures and fifty staples were required to close Otero's wounds. As a result of his injuries, Otero is no longer able to exercise as he once did, and walking is difficult due to an injury he sustained to his knee.

Although Otero has no recollection of talking to a police officer at the hospital, he was, in fact, interviewed by Sergeant Jeff Rousseau soon after arriving at the hospital. Rousseau testified that Otero told him that his

---

[6] It should be noted, however, that on direct examination Miano stated that she did see blood on the defendant's shirt after the altercation. On cross-examination, though, she admitted that she had not, in fact, seen any blood on the defendant.

assailants, two men and a woman, were in a newer gray Infiniti. He described both men as light-skinned black males, approximately twenty-seven to twenty-eight years old. The stockier of the two men had freckles on his face. According to Rousseau, Otero was not sure that he could identify the perpetrators, but he did not rule out identification. Otero gave Rousseau Miano's cell phone.

The defendant was arrested pursuant to a warrant[7] and subsequently was charged with assault in the first degree while aided by two or more persons in violation of General Statutes § 53a-59 (a) (4), conspiracy to commit assault in the first degree while aided by two or more persons in violation of General Statutes §§ 53a-48 and 53a-59 (a) (4), accessory to assault in the first degree in violation of §§ 53a-8 and 53a-59 (a) (1), and conspiracy to commit assault in the first degree with a dangerous instrument in violation of §§ 53a-48 and 53a-59 (a) (1).

During trial, the defendant filed a motion to suppress Otero's out-of-court identification and to prevent any in-court identifications on the basis of his claim that the out-of-court identification was unnecessarily suggestive, and that any subsequent in-court identification would be tainted by the improper out-of-court identification and would thus lack an independent basis. During trial, after an evidentiary hearing outside the

---

[7] Robert Acevedo and Anna Acevedo also were arrested and charged in separate files. Robert Acevedo pleaded guilty to conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (4) and was sentenced to five years in prison. Anna Acevedo pleaded guilty to assault in the third degree in violation of General Statutes § 53a-61, reckless endangerment in the first degree in violation of General Statutes § 53a-63, unlawful restraint in the second degree in violation of General Statutes § 53a-96, threatening in the second degree in violation of General Statutes § 53a-62 and breach of the peace in the second degree in violation of General Statutes § 53a-181. She received suspended sentences. Neither Robert Acevedo nor Anna Acevedo testified at trial.

presence of the jury, the court denied the defendant's motion in this regard, finding that although the initial identification was unnecessarily suggestive, it and the subsequent in-court identifications were reliable. At the close of the evidence, the court granted the defendant's motion for a judgment of acquittal as to the charge of assault in the first degree while aided by two or more persons. The jury found the defendant guilty of accessory to assault in the first degree by means of a dangerous instrument and not guilty of the two conspiracy charges. The court thereafter sentenced the defendant to nine years incarceration, to run concurrent with the time remaining on a preexisting sentence, followed by eight years of special parole. The defendant appealed from the judgment of conviction. Additional facts will be set forth as necessary.

I

The defendant's first claim is that the court improperly denied his motion for a judgment of acquittal after the verdict, as there was insufficient evidence that he intended to cause Otero serious physical injury or knew that anyone involved in the altercation was armed with, or used, a deadly weapon or dangerous instrument.[8] We disagree.

Count two of the amended substitute information alleges, in relevant part, that the state accuses the defendant "of accessory to assault in the first degree, and charges that on or about February 15, 2008 . . . [the defendant] with intent to cause serious physical injury to another person by means of a dangerous instrument, did intentionally aid another who caused such injury to such person . . . in violation of Sections 53a-8 and 53a-59 (a) (1) . . . ."[9] Following the presentation of

[8] The defendant was not charged with use of a deadly weapon.

[9] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct

evidence, the defendant orally moved for a judgment of acquittal as to all counts. The court denied the motion as to count two, among others, and the jury found the defendant guilty of accessory to assault in the first degree by means of a dangerous instrument. Subsequently, on November 2, 2009, the defendant filed a motion for a judgment of acquittal, which the court denied on January 7, 2010.

In denying the defendant's postverdict motion for a judgment of acquittal, the court stated: "On the basis of all the evidence presented at trial and the logical inferences that can be drawn therefrom, it is my assessment that the jury reasonably could and did conclude that all of the elements of accessory to assault in the first degree as alleged[10] were proven beyond a reasonable doubt. . . . The defendant was the first out of the car. A one-on-one fistfight ensued, lasting a matter of seconds, which [Otero] was winning. [Robert Acevedo and Anna Acevedo] jumped out of the car, one of the two striking [Otero] from behind and knocking him down on the sidewalk. Up to that point, [Otero] had not been stabbed.

"There was no interlude between the face-to-face fistfight and [Otero] being knocked to the ground from behind. And immediately while on the ground covering up, he was kicked, punched, struck from all angles by three people. [Miano] was not involved in the assault

which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument . . . ."

[10] The court stated, as a preliminary matter, that "[i]t is enough for the state to prove that the defendant, acting with the intent to cause serious physical injury to [Otero] . . . intentionally aided another person to cause serious physical injury to [Otero] by means of a dangerous instrument."

of [Otero]. That left [Robert Acevedo and Anna Acevedo] and the defendant as the three persons assaulting [Otero] as he was down on the ground. The on-the-ground portion of this incident lasted a matter of seconds. When it was over, [Otero] had been stabbed seven times while on all fours covering up and while being beaten, hit and assaulted by three persons, one of whom was the defendant. All four, the defendant included, left the scene together in the Infiniti when the police arrived or [when] they were approaching. Additionally, there was evidence that earlier in the evening the defendant had a knife, which was placed back in the car in order to gain entry into [Club NV]. And the jury heard evidence of the observation in the car . . . they drove from the scene.

"In my view, that evidence in its entirety, if believed, and the reasonable inferences that can be drawn therefrom, support the conclusion of applying a beyond a reasonable doubt standard that the defendant intended to cause serious physical injury. And given the close contact while [Otero] was on the ground . . . that he knew one of the three had and was using an implement capable of causing serious physical injury. Seven stab wounds inflicted within an incident of a very short duration with all three closely huddled around the on-the-ground victim, pummeling him, supports a reasonable inference regarding the awareness that multiple stab wounds were being inflicted, as well as an intent to cause serious physical injury.

"With reference to the element, 'intentionally aid,' evidence of repeated intentional striking, kicking, et cetera, of the on-the-ground victim over a matter of seconds, during which time [Otero] was being stabbed seven times, and thereby keeping him down and inhibiting or preventing him from resisting or defending himself, amounts, in my view, to intentionally aiding the one of the three who was doing the stabbing, that is,

the one committing the assault in the first degree with a dangerous instrument." On the basis of our review of the evidence and the law, we conclude that the trial court properly denied the defendant's postverdict motion for a judgment of acquittal.

We employ a two part test when reviewing claims of insufficient evidence. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Arthurs*, 121 Conn. App. 520, 524, 997 A.2d 568 (2010).

"[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres*, 242 Conn. 485, 490, 698 A.2d 898 (1997). Although the jury may draw reasonable and logical inferences from the facts proven, it "may not resort to speculation and conjecture." (Internal quotation marks omitted.) *State* v. *Giguere*, 184 Conn. 400, 403, 439 A.2d 1040 (1981).

The jury "must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical . . . to conclude that a basic fact or an inferred fact is true, the [jury] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Liborio A.*, 93 Conn. App. 279, 283–84, 889 A.2d 821 (2006). Furthermore, "our review requires us to consider all of the evidence presented at trial, irrespective of any alleged impropriety . . . . [T]o evaluate the sufficiency of the evidence presented, we assess all the evidence admitted at trial." *State* v. *Coyne*, 118 Conn. App. 818, 826, 985 A.2d 1091 (2010).

The defendant in this matter was charged as an accessory to assault in the first degree by means of a dangerous instrument. For the purpose of determining criminal liability as an accessory, it is of no consequence whether one is labeled an accessory or a principal. *State* v. *Bagley*, 35 Conn. App. 138, 142, 644 A.2d 386, cert. denied, 231 Conn. 913, 648 A.2d 157 (1994). "[T]o establish a person's culpability as an accessory to a particular

offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense." *State* v. *Patterson*, 276 Conn. 452, 483, 886 A.2d 777 (2005).

"To warrant a conviction for assault in the first degree in violation of § 53a-59 (a) (1), the state bore the burden of proving the following elements beyond a reasonable doubt: (1) the defendant possessed the intent to cause serious physical injury to another person; (2) the defendant caused serious physical injury to such person . . . and (3) the defendant caused such injury by means of a deadly weapon or a dangerous instrument." *State* v. *Holmes*, 75 Conn. App. 721, 740, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003). "[A] conviction under § 53a-8 requires [the state to prove the defendant's] dual intent . . . [first] that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged. . . . Additionally, one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Citation omitted; internal quotation marks omitted.) *State* v. *Heinemann*, 282 Conn. 281, 313, 920 A.2d 278 (2007).

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . It is axiomatic that a factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 207, 792 A.2d 856 (2002). Here, the jury reasonably could have inferred that the defendant intended

to aid the principal to inflict serious physical injury to Otero and that the principal used a dangerous instrument.

The defendant claims that it was impermissible speculation for the court to conclude that "[s]even stab wounds inflicted within an incident of a very short duration with all three [people who had attacked Otero] closely huddled around the on-the-ground victim, pummeling him, supports a reasonable inference regarding the awareness that multiple stab wounds were being inflicted, as well as an intent to cause serious physical injury." He also argues that "the small, quiet nature of a knife blow, the brevity of the incident, the dim lighting, and the inherent stress and chaos of the fight all make it virtually impossible for [the defendant] to have noticed whether [Robert Acevedo or Anna Acevedo] was using a knife . . . ."[11] We disagree.

The evidence admitted at trial was adequate to permit the jury to conclude that the defendant was present when either Robert Acevedo or Anna Acevedo caused Otero to fall to the sidewalk and, in concert with the two of them, surrounded Otero, whom they struck, kicked and pummeled as he protected his head. The jury was not required to, but reasonably could have, inferred that the defendant intended to aid the principal in causing Otero serious physical injury.

Serious physical injury "means physical injury which creates a substantial risk of death, or which causes

---

[11] There is no evidence of the type of instrument that caused Otero's injuries. Throughout his brief the defendant argues that there was no evidence that he knew one of the other assailants had a knife and, in making this argument, he attempts to distinguish the knowing presence of a knife from that of a gun. From the nature and extent of Otero's injuries, the jury reasonably could infer that a dangerous instrument was used and that the defendant was aware of the use of a dangerous instrument by one of the assailants. See *State* v. *Barnett*, 53 Conn. App. 581, 592–93, 734 A.2d 991, cert. denied, 250 Conn. 918, 738 A.2d 659 (1999).

serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4). In this matter, the jury heard evidence that Otero sustained a laceration to his thumb that revealed the bone and seven stab wounds that required twenty stitches and fifty staples to close. Otero was hospitalized for several days, required additional surgery and had not fully recovered as of the time of trial. "[I]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Barnett*, 53 Conn. App. 581, 592–93, 734 A.2d 991, cert. denied, 250 Conn. 918, 738 A.2d 659 (1999).

"A dangerous instrument means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is *capable of causing* death or serious physical injury . . . . [A] dangerous instrument may be an ordinary object not designed to cause death or serious physical injury . . . [and each] case must be individually examined to determine whether, under the circumstances in which the object is used or threatened to be used, it has the potential for causing serious physical injury." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 590.

In the present case, the jury heard evidence that prior to entering Club NV, the defendant left a knife in the Infiniti. After leaving Club NV, Robert Acevedo attempted to run over Otero with his automobile

because he had spoken with Miano, Robert Acevedo's date for the evening. Thereafter, the defendant briefly entered the Infiniti before confronting Otero and initiating a fistfight with him. Robert Acevedo and Anna Acevedo then got out of the Infiniti and, shortly after, Otero was hit from behind, causing him to fall to the sidewalk. When the defendant and Robert Acevedo and Anna Acevedo became aware of the police presence, they got into the Infiniti and drove away. As a result of the altercation, Otero suffered a deep cut to his thumb and seven stab wounds to his torso and arms that required surgical intervention. Otero was unable to walk and exercise as he once had. On the basis of this evidence, the jury reasonably could have inferred, beyond a reasonable doubt, that the defendant participated in an assault upon Otero and, given the nature of Otero's wounds, that the defendant intended to cause Otero serious physical injury. See *State* v. *Hines*, 89 Conn. App. 440, 449–50, 873 A.2d 1042, cert. denied, 275 Conn. 904, 882 A.2d 678 (2005); *State* v. *Holmes*, supra, 75 Conn. App. 742 (intent inferred from conduct and cumulative effect of circumstantial evidence).

The defendant also claims that there was no evidence that he knew that a knife was used in the assault on Otero. The crime of which the defendant was found guilty does not require that he knew of the presence of a knife, if indeed, that is the instrument that caused Otero's injuries. See General Statutes § 53a-8 (a).

Our Supreme Court has held that "to establish accessorial liability under § 53a-8 for manslaughter in the first degree with a firearm . . . the state must prove that the defendant, acting with the intent to cause serious physical injury to another person, intentionally aided a principal offender in causing the death of such person . . . and that the principal, in committing the act, used, carried or threatened to use a firearm." *State*

v. *Gonzalez*, 300 Conn. 490, 496, 15 A.3d 1049 (2011);[12] see also *State* v. *Miller*, 95 Conn. App. 362, 896 A.2d 844, cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006). "Connecticut case law remains consistent . . . in permitting the imposition of accessorial liability pursuant to § 53a-8, without requiring that the defendant intend to satisfy a criminal statute's aggravating circumstance in cases wherein that aggravating circumstance does not have a specific mental state and requires only that the principal act with the general intent to perform the proscribed act." *State* v. *Gonzalez*, supra, 506. Although the crime in *Gonzalez* was manslaughter in the first degree with a firearm as an accessory, and the crime at issue in this case is assault in the first degree with a dangerous instrument as an accessory, the statutory language as to the aggravating circumstances in each crime lacks the requirement of specific intent. See General Statutes § 53a-55a.[13]

Therefore, in the present case, the state was not required to prove that the defendant intended to cause serious physical injury *by means of a dangerous instrument,* or to prove that the defendant was even aware that another participant had a dangerous instrument or knife. See *State* v. *Avila*, 223 Conn. 595, 608, 613 A.2d 731 (1992). The use of a dangerous instrument simply represents the means by which the defendant is alleged to have participated in causing the serious physical

[12] The issue in *Gonzalez* concerned a jury instruction regarding an element of the offense of manslaughter in the first degree with a firearm; see General Statutes §§ 53a-8 and 53a-55a; "namely, the defendant's intention that the principal would use, carry or threaten the use of a firearm during the commission of the offense." *State* v. *Gonzalez*, supra, 300 Conn. 492.

[13] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

injury, but to be culpable, the defendant only needs to have the intent to cause serious physical injury to another person, not the intent to do so with a dangerous instrument. The jury, therefore, reasonably could have inferred that the defendant intended to aid another to inflict serious physical injury upon Otero and that the principal used a dangerous instrument. We conclude, therefore, that the court properly denied the defendant's postverdict motion for a judgment of acquittal.

II

The defendant's second claim is that the court abused its discretion by denying his motion to suppress Otero's out-of-court and in-court identifications. Specifically, he claims that, although the court found that the police identification procedure was unnecessarily suggestive,[14] the court improperly concluded that Otero's identifications of him nevertheless were reliable. We agree.

We first set forth the principles of law that guide our analysis. The parameters of the admissibility of pretrial photographic identifications and later in-court identifications by victims and witnesses in criminal cases are well established. At the outset, "[i]t is absolutely clear that the admission of evidence concerning a pretrial identification procedure that was unnecessarily suggestive and resulted in an unreliable identification violates a person's rights to due process under both the federal and state constitutions." *State* v. *Reddick*, 224 Conn. 445, 478, 619 A.2d 453 (1993) (*Berdon, J.*, dissenting). In assessing a claim on appeal that evidence of both an out-of-court pretrial identification and an in-court identification should be suppressed, the defendant bears the initial burden of proving that the identification(s) resulted from an unconstitutional procedure.

[14] The state conceded at oral argument that the identification procedure employed by Jeremy Bilbo, a Hartford police detective, was unnecessarily suggestive.

*State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984). Our Supreme Court in *Reddick* prescribed a multistep course for a trial court to follow when confronted with a claim that identification evidence should be excluded. *State* v. *Reddick,* supra, 465. The court must first determine whether the out-of-court identification procedure was unnecessarily suggestive. If the court answers that question in the negative, there is no need for the court to consider its reliability separately. *State* v. *Outing,* 298 Conn. 34, 55, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). If, on the other hand, the court finds that the out-of-court identification procedure was unnecessarily suggestive, the court must then consider whether the identification procedure was, nevertheless, reliable based on an examination of the totality of the circumstances. *State* v. *Taylor,* 239 Conn. 481, 498, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997).

Finally, if the court determines that an out-of-court identification has occurred under conditions that are unnecessarily suggestive and unreliable, the burden at trial is on the state to establish by clear and convincing evidence under the totality of the circumstances that the in-court identification is based upon the witness' independent recollection, untainted by the faulty pretrial identification process.[15] See *United States* v. *Wade,* 388 U.S. 218, 240, 87 S. Ct. 1926, 18 L. Ed. 2d 1149

---

[15] We note that at trial, understandably, the state did not provide any evidence that the in-court identification was untainted by the unreliable and unnecessarily suggestive out-of-court identification, as the trial court had determined that the out-of-court identification was reliable. Nevertheless, on review, and in light of our determination that the admission of the out-of-court identification was improper, we review the record to determine if, in fact, the state satisfied its burden of proving that the in-court identification was untainted. Because the state made no effort to do so and the record reflects this lack of effort, we conclude that the state did not show, at trial, that the in-court identification was free of taint.

(1967); see also *Moore* v. *Illinois,* 434 U.S. 220, 225–26, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977); *State* v. *Mitchell,* 204 Conn. 187, 204, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 923, 98 L. Ed. 2d 252 (1987); *State* v. *Guertin,* 190 Conn. 440, 458–59, 461 A.2d 963 (1983); *State* v. *Gordon,* 185 Conn. 402, 418, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). In making this assessment, the task of the trial court is to determine whether an in-court identification that follows an impermissibly suggestive out-of-court identification has been tainted so as to render its admission a violation of a defendant's due process rights. *State* v. *Manson,* 118 Conn. App. 538, 548, 984 A.2d 1099 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010). In short, an in-court identification after an unnecessarily suggestive and unreliable out-of-court identification procedure should be allowed only "if it is purged of the taint of the defective pretrial procedure by establishment of the fact that it is based upon disassociated and independent observation." (Internal quotation marks omitted.) *State* v. *Piskorski,* 177 Conn. 677, 741–42, 419 A.2d 866 (superseded by statute on other grounds as stated in *State* v. *Canady,* 187 Conn. 281, 283–84, 445 A.2d 895 [1982]), cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

The court's first task, to determine whether the pretrial identification procedure was unnecessarily suggestive, requires the court to consider first whether the procedure was suggestive and then, if so, whether the suggestive identification was nevertheless justified under the particular circumstances. *State* v. *Reddick,* supra, 224 Conn. 465. If the court finds that the procedure was unduly suggestive, the court's assessment of whether the unduly suggestive identification and any subsequent in-court identification are nonetheless reliable must be based on an examination of the totality of the circumstances. Id. The United States Supreme

Court in *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), provided guidance for trial courts in assessing whether an unnecessarily suggestive pretrial identification may nonetheless be admitted at trial. The court enumerated a nonexclusive list of factors to be considered in assessing admissibility. Id., 114–16. Those factors include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his or her prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation. Id.; see also *State* v. *Gordon*, supra, 185 Conn. 415. These factors, however, must be weighed against the corrupting effect of the suggestive identification itself, for "[w]here the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Perry* v. *New Hampshire*, U.S. , 132 S. Ct. 716, 719, 181 L. Ed. 2d 694 (2012); *Manson* v. *Brathwaite*, supra, 116; *State* v. *Gordon*, supra, 415.

The issue of whether an out-of-court identification was unnecessarily suggestive involves a mixed question of law and fact. *State* v. *Marquez*, 291 Conn. 122, 136, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Accordingly, our review is plenary. Id. Additionally, "because the issue of the suggestiveness of a photographic array implicates the defendant's constitutional right to due process, we undertake a scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Internal quotation marks omitted.) Id., 137; see *State* v. *Mullins*, 288 Conn. 345, 364, 952 A.2d 784 (2008). In conducting our review of the issue of reliability, "we examine the legal question of reliability with exceptionally close scrutiny and defer less than

we normally do to the related fact finding of the trial court." (Internal quotation marks omitted.) *State* v. *Wooten,* 227 Conn. 677, 688, 631 A.2d 271 (1993), quoting *State* v. *Gordon,* supra, 185 Conn. 416; see also *State* v. *Marquez,* supra, 137; *State* v. *Figueroa,* 235 Conn. 145, 155, 665 A.2d 63 (1995).

Finally, if we find that the court incorrectly permitted, as reliable, evidence flowing from an unreliable and unduly suggestive identification procedure, there remains the further issue of whether the ensuing judgment of conviction may be affirmed on the ground that the due process violation was, nevertheless, harmless in light of all the evidence correctly adduced at trial and untainted by the admission of an unreliable identification. This question requires, in part, that we discuss whether the harmless error doctrine is applicable in this legal context and, if so, the parameters of a harmless error analysis in the context of a constitutional error.

Having set forth an overview of the applicable law regarding the admissibility of identification evidence, we now turn to an analysis of the issue at hand, that is, whether the defendant's due process rights were violated by the admission of unnecessarily suggestive and unreliable eyewitness identifications and, if so, whether the judgment must be reversed.

We first examine the question of whether the identification was unnecessarily suggestive.[16] The following supplemental facts are relevant to a discussion of this issue. At trial, Hartford police Officer Jose Rivera testified that he spoke with Otero at the scene shortly after

---

[16] While we recognize that the court found and the state has conceded that the pretrial identification procedure was unnecessarily suggestive, we briefly explore this issue as a preface to our later discussion of whether the record supports a conclusion that, in assessing reliability, the court properly weighed the factors for admissibility against the corrupting influence of the pretrial identification procedure utilized in this instance.

the assault and that Otero told him that he had initially been struck by a light-skinned black male, approximately five feet, eight inches tall and weighing 180 pounds, who had been the operator of an automobile that almost struck him and that the operator had been the first one to get out of the car. On cross-examination, Rivera confirmed that Otero had made no mention of any of the perpetrators having facial freckles. On direct examination, Otero indicated that he had not seen the initial perpetrator before and that he did not know his name. Rivera further testified that Otero indicated to him that he could not positively identify anyone else involved.

Following Rivera, Otero testified and made an in-court identification of the defendant. He also testified that he had made an out-of-court identification. Otero stated that in the weeks following the incident he received secondhand and thirdhand reports, giving him names of people who might have been involved, including the name "Hershey," which he was told was the defendant's street name.[17] Otero stated that in May, 2008, while at the Hartford police station, he was shown a photographic array of eight individuals from which he was not able to make a positive identification. The defendant's photograph was not part of this array. Otero testified that after he had been told by others, secondhand and thirdhand, that the defendant had been involved in the attack on him, he looked the defendant up on the department of correction website and discovered that the defendant was incarcerated. He stated that on the day he gave Hartford Detective Jeremy Bilbo the defendant's name, Bilbo then brought up the defendant's photograph on his computer. Otero testified that while he expected to see several photographs on the

---

[17] Later in the trial, Miano testified that Hershey was the street name for Robert Acevedo, who she said had been her boyfriend at the time of the incident and the operator of the car that nearly struck Otero.

computer screen, there was only one photograph, that of the defendant, and that upon seeing the defendant's photograph, he immediately identified him as the initial assailant.

Bilbo testified that in May, 2008, he showed Otero a photographic array with eight photographs that did not include the defendant. From this array, Otero was not able to make any positive identifications, although he did indicate that two of the photographs were similar to the person who attacked him. One of the photographs tentatively selected by Otero was that of Robert Acevedo. Bilbo indicated, as well, that in June, 2008, he prepared a photographic array for Otero and that this array included the defendant's photograph. However, he did not show this array to Otero because he did not believe that Otero could identify any of his attackers. Nevertheless, Bilbo testified that six or seven months later he did show Otero a booking photograph of the defendant, with the name "Artis" printed across the front of the shirt of the person depicted, while telling Otero that it was a photograph of the defendant, that the defendant was a suspect in the case, and that he was seeking an arrest warrant for him. Contrary to Otero's testimony, Bilbo claimed that Otero was not able to identify the defendant from this one photograph even though he told Otero that it was a photograph of the defendant. Bilbo stated, as well, that when shown the photograph of the defendant, Otero responded that he did not know who his attackers were and acknowledged that he could not identify them. Bilbo did not, at any time before or after he showed Otero the single booking photograph, display the photographic array to him that included the defendant's photograph.

Confronted with the inconsistency between Otero's testimony that he positively identified the defendant from the one photograph shown to him and Bilbo's testimony that Otero did not make an identification,

the court concluded, after hearing a motion to suppress, that Otero's testimony was more credible in this regard than Bilbo's.[18] The court, therefore, concluded that Otero had made an out-of-court pretrial identification of the defendant as the initial assailant.

While in a claim of a wrongfully admitted photographic identification, our review of the record is more scrupulous than the norm, it is not our function to make our own credibility determination from the bare record. In this instance, the record provides ample basis for the court to have concluded, as it did, that Otero identified the defendant as his assailant from the one photograph shown to him by Bilbo.[19]

On the basis of these facts, there can be no question that this identification procedure was improper and that it was clearly not made necessary by any extenuating circumstances. Indeed, to characterize the process as merely suggestive belies the facts found by the court. It is undisputed that after Otero had told Bilbo of his belief in the defendant's involvement in the assault that Bilbo then showed the defendant's photograph to Otero while identifying the person in the photograph as the defendant and simultaneously telling Otero that the defendant was a suspect whose arrest he would be

[18] The record reveals that the court conducted the hearing on the defendant's motion to suppress after the trial had commenced and following the testimony of Rivera.

[19] The lexicon of witness identification does not fit the factual circumstances we confront. When Otero told Bilbo that he had heard from the street of the defendant's involvement in the incident and he had learned that the defendant was incarcerated, Bilbo, in turn, confirmed Otero's belief and buttressed it by stating that he was seeking the defendant's arrest while simultaneously displaying a photograph of the defendant wearing a shirt with the word "Artis" across its front. What ensued could more fairly be termed a "confirmation" rather than an identification. Nevertheless, the court determined that it was an identification. As such, its use at trial became a leg of the state's proof. Because neither party disputes the court's characterization of this event as an identification, we, too, treat it as the same for the purposes of this appeal.

seeking. It would be difficult to conceive of a less neutral or more preemptive identification process than the one that occurred in this instance. It was against the backdrop of this dramatically improper identification process that the court was required to assess the identification's reliability.[20]

Our Supreme Court has stated that "almost any one-to-one confrontation between a victim of a crime and a person whom the police present as a suspect is presumptively suggestive . . . because it conveys the message to the victim that the police believe the suspect is guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Wooten,* supra, 227 Conn. 686; see also *State* v. *Randolph,* 284 Conn. 328, 385–86, 933 A.2d 1158 (2007) (danger of misidentification "will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw" [internal quotation marks omitted]); *State* v. *Crosby,* 36 Conn. App. 805, 819, 654 A.2d 371 ("[w]ithout question, almost any one-to-one confrontation between a victim and a suspect must convey the message that the police have reason to believe him guilty, and is therefore unnecessarily suggestive"), cert. denied, 232 Conn. 921, 656 A.2d 669 (1995). In this

---

[20] At trial, Bilbo claimed that he did not show the photograph of the defendant to Otero for identification purposes but, rather, only for information purposes to bring Otero abreast of the investigation, as Otero had been interested in the investigation. He explained that he was simply trying to inform Otero that the case was progressing, that the defendant was a suspect whose arrest he would be seeking and that it was only in this context that he showed the defendant's photograph to Otero. Despite this unusual claim, the state offered Otero's identification of the defendant from this photograph as an out-of-court identification and argued to the jury in the same vein. The court charged, as well, that this was evidence of an out-of-court identification of the defendant by Otero. Therefore, notwithstanding Bilbo's claim to the contrary, Otero's "identification" of the defendant in response to seeing his photograph while being told simultaneously by Bilbo that it was, in fact, a photograph of the defendant, became part of an essential element of the state's case identifying the defendant as a participant in the assault.

instance, there was no implied message. To the contrary, Bilbo was clear and explicit in stating that the photograph was of the defendant, and that he was a suspect in the case whose arrest he was seeking. The process was not merely suggestive; it was preemptory and conclusive.

As to whether an overly suggestive identification procedure is necessary, the court will look to whether exigent circumstances existed, such as a show-up shortly after a crime while the victim's memory is fresh and to quickly eliminate any innocent persons. *State* v. *Wooten*, supra, 227 Conn. 686. Our Supreme Court has stated that an immediate viewing of the suspect may be justified where "it [is] important for the police to separate the prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigations with a minimum of delay." (Internal quotation marks omitted.) *State* v. *Collette*, 199 Conn. 308, 311, 507 A.2d 99 (1986). In this instance, in which the one photograph was shown to Otero months following the incident, the state properly makes no argument that exigent circumstances existed. As noted, Bilbo testified that by June, 2008, he had prepared a photographic array that included the defendant's photograph but that he did not show it to Otero because he had said he could not identify his attackers. Then, months later, for reasons he is unable to fully explain, he stated that he showed Otero a photograph of the defendant while simultaneously identifying him by name and characterizing him as a suspect whose arrest he was seeking. The state makes no claim, nor do we find any basis for concluding, that this identification procedure was necessary.

Having reached the conclusion that the out-of-court identification procedure was constitutionally flawed, we turn next to a consideration of whether, despite the failings of the process, Otero's out-of-court and in-court

identifications were reliable under all the circumstances. In making this assessment, we track the factors outlined in *Manson* v. *Brathwaite*, supra, 432 U.S. 114–16, and we weigh those factors against the corrupting influence of the improper identification.[21]

## A

### The Opportunity of the Witness to View the Defendant At the Time of the Assault

This consideration implicates factors that relate to the victim's condition at the time as well as the external environment. As to the former, and contrary to the trial court's finding that Otero consumed a "couple of beers" in the hour and one-half before the incident, Otero acknowledged that between 11:30 p.m. and 1 a.m., moments before the altercation, he consumed "[a]t least four" beers, which he described as twelve ounce bottles of Heineken beer.[22] One's level of intoxication, we know

---

[21] Contrary to the dissent's assertion, our analysis tracks the court's factual findings, parting from them only where specifically noted on the ground that the findings are erroneous. We do not, however, accord deference to the court's analysis of those factual findings, the weight accorded to them by the trial court in its assessment of reliability, and the court's balancing, if any, of these factors with the corrupting influence of the identification procedure, as that analysis, on appeal, requires de novo review. "The ultimate question as to the constitutionality of pretrial identification procedures is a mixed question of law and fact. Thus, we give deference to the trial court's finding of historical fact . . . but may give different weight to those facts and may reach a different conclusion." (Internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 137, quoting, with approval, *People* v. *Hogan*, 114 P.3d 42, 49 (Colo. App. 2004), cert. denied, 2005 Colo. LEXIS 597 (Colo. June 27, 2005).

[22] The dissent attempts to minimize the significance of the court's erroneous factual conclusion regarding the amount of alcohol consumed by Otero as a "likely error in finding that the victim consumed only a couple of beers that night . . . ." (Internal quotation marks omitted.) The dissent fails to note that Otero acknowledged not only that he consumed four, twelve ounce bottles of beer but that he did so in the time of approximately one and one-half hours immediately preceding the assault. Finally, the dissent seeks to marginalize this issue by noting Otero's testimony, notwithstanding the absence of any corresponding court finding, that, at the time of the assault, he weighed 250 pounds, as though his weight alone, if proven, would elimi-

from the reported research, plays a significant role in one's powers of observation and concentration. See G. Gaulkin, Report of the Special Master, *State* v. *Henderson*, New Jersey Supreme Court, Docket No. A-8-08 (June 18, 2010) p. 47, available at http://www.judiciary.state.nj.us/pressrel/HENDER SON%20FINAL%20BRIEF%20.PDF%20(00621142).PDF (court noted, as undisputed, finding that "the effects of alcohol on identification accuracy show that high levels of alcohol promote false identifications" and that "low alcohol intake produces fewer misidentifications than high alcohol intake").[23]

As to external influences on Otero's opportunity to see his assailant during the altercation, Otero testified that shortly after he left Club NV, and while he was en route to Club Blu, he was nearly run over by an automobile. With respect to the lighting, although it is clear that at 1 a.m. on an early February morning it was dark, Rivera testified that, in his experience, the area is well lit. Nevertheless, the record is not explicit regarding the lighting at the exact location of the assault or the distance of any artificial lighting from the site of the altercation. We recognize, however, that the assault took place on an urban street and that, as observed by the court, the lighting was sufficient for Otero to have described the make and model of the car that almost struck him.

---

nate the impact of Otero's alcoholic consumption. Most importantly, it is not evident from the record that the trial court gave any consideration to the likely effect on Otero of his consumption of forty-eight ounces of beer in a period of less than two hours immediately preceding the attack. Rather, the court appears to have relied on a lack of direct evidence to conclude that the alcohol consumption did not impact Otero's powers of concentration and observation in any manner at all.

[23] See generally J. Dysart, R. Lindsay, T. MacDonald & C. Wicke, "The Intoxicated Witness; Effects of Alcohol on Identification Accuracy from Showups," 87 J. Applied Psychol. 170, 174 (2002); see also G. Wells, A. Memon & S. Penrod, "Eyewitness Evidence: Improving Its Probative Value," 7 Psychol. Sci. in the Pub. Int. 2, 54 (2006).

Another factor relating to the victim's opportunity to observe his attacker is the amount of time involved in the incident. In this regard, Otero's testimony was inconsistent as to how long the altercation lasted.[24] According to Otero, during the brief duration of the incident, the passenger emerged from the automobile, approached him, struck him in the face and shoulder, and he punched back; each landed approximately two punches before Otero was struck from behind and landed on all fours. At one point during his testimony, Otero was unequivocal in stating that the verbal exchange between himself and his assailant lasted "less than two seconds" before the physical fight began. Otero further acknowledged that the physical altercation started with the assailant landing a punch to his face. At another point in his testimony, Otero stated that he had been face-to-face with the initial assailant for "five, ten" seconds. Elsewhere in his testimony, Otero stated, as to the incident, "I mean, it was fast. Everything happened so fast."[25]

In its analysis of this factor, the court concluded that Otero had an adequate opportunity to see the assailant, and the court made reference to Otero's testimony that he was face-to-face with the assailant for five to ten seconds. The court, however, made no explicit determination of the length of time Otero and his assailant were face-to-face, other than stating it was only a few

---

[24] On October 16, 2009, Otero stated that the fistfight alone lasted ten seconds. On October 19, 2009, Otero testified that it was no more than ten seconds from the time the passenger emerged from the front passenger seat of the automobile until he was struck from behind. On that same date, he testified that he and his assailant exchanged words for "not even two seconds" before the fistfight started in which the assailant struck the first blow to his face.

[25] Although this testimony took place before the court in the absence of the jury, it is nevertheless pertinent to our inquiry, as our review focuses on the court's determination of reliability and not on the jury's ultimate conclusions.

seconds. Rather, the court based its conclusion on its view that "a good hard look will pass muster, even if it occurs during a fleeting glance"; (internal quotation marks omitted); quoting *State* v. *Cubano*, 203 Conn. 81, 95, 523 A.2d 495 (1987), and citing *State* v. *Ledbetter*, 185 Conn. 607, 615, 441 A.2d 595 (1981). Interestingly, the "fleeting glance" referred to in *Cubano* was a period of several minutes when the witness was within two or three feet of the defendant; *State* v. *Cubano*, supra, 95; and the "fleeting glance" in *Ledbetter* consisted of the witness viewing the robber's face for approximately "fifteen or twenty seconds . . . ." *State* v. *Ledbetter*, supra, 615. Apparently finding comfort in the "fleeting glance" references of these earlier decisions, the court substantially compressed the time period in which a victim may be found to have had a "good hard look."[26]

B

The Witness' Degree of Attention

To buttress its conclusion regarding Otero's opportunity to observe the defendant, the court noted not only

[26] We acknowledge that both this court and our Supreme Court have found that a mere matter of seconds can provide a proper opportunity for a witness to view an assailant or incident. See *State* v. *Piskorski*, supra, 177 Conn. 742; *Williams* v. *Bronson*, 21 Conn. App. 260, 265, 573 A.2d 330 (1990); *State* v. *Tate*, 9 Conn. App. 141, 146, 516 A.2d 1375 (1986). However, in those cases the court emphasized that although the opportunity to view may have lasted only a few seconds, additional factors were present to allow the witness to have a sufficient view of the incident or assailant in question in such a short period of time. In *Piskorski*, the court noted that while the witness was able to view the assailant only for a matter of seconds, that she was looking into a well lit building on a clear night, the witness had an unobstructed view of the assailant, she was familiar with the area in question and that she was able to focus solely on the person in question, as she was a passenger in an automobile and, thus, was not distracted. *State* v. *Piskorski*, supra, 739, 743. Similarly, in *Tate*, the court focused on the fact that although the witness' view of the defendant lasted only a few seconds, it was a bright day, she had an unobstructed view of the defendant and she was able to identify the defendant's clothing from head to toe with "remarkable accuracy . . . ." *State* v. *Tate*, supra, 146. Thus, a few seconds has been considered sufficient for a proper opportunity to view when other mitigating factors are present that allow the witness to optimize their momentary view. In the

that Otero gave an apt description of the defendant's physical appearance but that he had been concentrating on his attacker. In this regard, the court noted, "[Otero's] observation of and description of such [a] facial feature [as freckles] is not merely indicative of [a] perfectly adequate opportunity to observe but also confirms that his concentration was on the perpetrator's face, unlike moments later when he was struck from behind and unable to see or identify his other attackers . . . ." This characterization, however, is inaccurate as, during the trial, Rousseau testified that when he met with Otero at the hospital shortly after the assault, Otero gave him descriptions of three people, one light-skinned black male, twenty-seven to twenty-eight years old, five feet, eight inches to five feet, nine inches tall, and 180 pounds, a light-skinned black male with freckles, twenty-seven to twenty-eight years old, five feet, nine inches, 200 pounds and stocky as the front seat passenger, and a black female, twenty-three to twenty-four years old, five feet, three inches, 120 pounds, whom he did not think was involved in the assault. Furthermore, in this regard, Bilbo testified that when he showed Otero an array of eight photographs, including a photograph of Robert Acevedo, Otero picked out Robert Acevedo and another person as similar to the person who had attacked him. This uncontradicted testimony of Otero's detailed descriptions of three individuals allegedly at the scene of the attack and his successful selection of the photograph of Robert Acevedo as looking similar to his attacker contradict the court's conclusion regarding the level of Otero's concentration on his attacker.[27]

present case, none of the supporting factors referenced in *Piskorski* or *Tate* is present.

[27] Of course, Otero's selection of the photograph of Robert Acevedo as looking, in appearance, similar to his attacker, is particularly interesting, as Rivera, the first police officer to arrive at the scene of the altercation, reported that Otero initially claimed that he had been attacked by the vehicle's operator, whom Miano identified as Robert Acevedo and whose descrip-

Also relevant to Otero's opportunity to view the defendant as his initial assailant is the conflicting testimony regarding the location of the assailant immediately before the incident. Although Rivera testified that Otero told him at the scene that his initial assailant had been the driver of the Infiniti automobile, Otero testified that the assailant had alighted from the front passenger seat of the automobile. Miano, however, testified that she had been the front right side passenger and that the defendant had been either in the vehicle's backseat or in the process of getting into or out of the car.[28] This conflicting evidence not only speaks to the confused circumstances regarding the fast-moving events that resulted in Otero's injuries but also erodes confidence in the accuracy of his observations at the moment. Finally, it is noteworthy that Otero was not, at any time, able to provide a description, in any manner, of the clothes worn by his assailant.

Thus, although Otero testified that he and the defendant were face-to-face as they exchanged punches, the

tion fits the defendant's with the possible exception of the defendant's freckled facial complexion.

[28] In its factual findings attendant to its ruling on the defendant's motion to suppress, the court incorrectly determined that Bilbo testified that Miano told him that the defendant had been the front seat passenger. From our review of the record, we find no such testimony from Bilbo. In fact, to the contrary, Miano testified that she had been the front seat passenger. While this erroneous factual discrepancy may seem trivial, it takes on more importance in light of subsequent descriptions of the physical characteristics of Robert Acevedo and the defendant. As noted, Otero told the first responding officer that the initial assailant had been the driver of the vehicle and described him as a light-skinned black male, approximately twenty-seven to twenty-eight years old and 180 pounds. The other male in the vehicle was described similarly, except that his weight was put at 200 pounds, a weight the court characterized as fitting the defendant "right on the button . . . ."

If the evidence that the initial aggressor was the car's driver and the general description points to Robert Acevedo as the initial aggressor, the state's case against the defendant is substantially weakened, as Otero was not able to provide any closeup description of the subsequent assailants due to the fact that they attacked him from behind.

undisputed testimony from the record reveals that their confrontation in this melee of a few seconds took place in the context of a heated verbal exchange during which Otero was struck twice by his assailant, in the shoulder and facial area, and during which Otero struck the assailant two times. Although there was no direct evidence regarding Otero's emotional condition at the time, it is reasonable to infer that, just having nearly been struck by an automobile and in the midst of a heated physical and verbal exchange, he was agitated and under stress. The notion that a person's level of stress has a correlation to that person's accuracy of observation and recall is not novel and has support in decisional law as well as in social science.[29] In 1976, the United States Court of Appeals for the Sixth Circuit, in *United States* v. *Russell*, 532 F.2d 1063 (6th Cir. 1976), observed, "[t]here is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement. . . . This problem is important because of all the evidence that may be presented to a jury, a witness' in-court statement that 'he is the one' is probably the most dramatic and persuasive."[30] (Citations omitted.) Id., 1066–67. In a similar vein, the Utah

[29] In *State* v. *Outing*, supra, 298 Conn. 105–106, Justice Richard N. Palmer, in a concurring opinion, noted that abundant scientific studies had shown that "a high level of stress at the time of the witness' observations may render the witness less able to retain an accurate perception and memory of the events . . . ." It is not evident from the trial court's assessment of Otero's identification testimony that the court took the tumultuous circumstances of the melee into consideration.

[30] The literature of social science is in accord. See G. Wells, A. Memon & S. Penrod, "Eyewitness Evidence: Improving Its Probative Value," 7 Psychol. Sci. in the Pub. Int. 2, 52–53 (2006); see also C. Morgan III, G. Hazlett, A. Doran, S. Garrett, G. Hoyt, P. Thomas, M. Baranoski & S. Southwick, "Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress," 27 International J.L. & Psychiatry 265, 274 (2004) ("[c]ontrary to the popular conception that most people would never forget the face of a clearly seen individual who had physically confronted them and threatened them for more than 30 min[utes] . . . [t]hese data provide

Supreme Court observed, "[c]ontrary to much accepted lore, when an observer is experiencing a marked degree of stress, perceptual abilities are known to decrease significantly." *State* v. *Long*, 721 P.2d 483, 489 (Utah 1986); see also *State* v. *Henderson*, 208 N.J. 208, 262, 27 A.3d 872 (2011) ("[w]e find that high levels of stress are likely to affect the reliability of eyewitness identifications"); *State* v. *Cromedy*, 158 N.J. 112, 124, 727 A.2d 457 (1999) ("[t]here is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement" [internal quotation marks omitted]); *State* v. *Dubose*, 285 Wis. 2d 143, 166 n.10, 699 N.W.2d 582 (2005) (same).

## C

### The Accuracy of the Witness' Prior Description of the Defendant

As noted by the trial court, Otero's identification of the defendant was accurate except with respect to his age. Rivera testified that Otero described his assailant as a light-skinned black male, approximately five feet, eight inches tall and weighing approximately 180 pounds.[31] Bilbo testified that Otero had described his assailant to another officer as the front right seat passenger of the automobile that almost struck him and that this person was a light-skinned black male with freckles on his face. Rousseau testified that he had gone to the hospital after the incident and obtained from

robust evidence that eyewitness memory for persons encountered during events that are personally relevant, highly stressful, and realistic in nature may be subject to substantial error").

[31] While an initial description of the assailant as 180 pounds differs only slightly from a description of the assailant as weighing 200 pounds, the difference has added meaning to a fact finder attempting to distinguish between two men whose descriptions are otherwise very similar, as is the case with the defendant and Robert Acevedo.

Otero descriptions of three individuals. Otero told Rousseau that the front seat passenger was a light-skinned black male with freckles, twenty-seven to twenty-eight years old, approximately five feet, nine inches, 200 pounds and stocky. Otero described another assailant as a light-skinned black male, approximately twenty-seven to twenty-eight years old, five feet, eight inches to five feet, nine inches tall, and weighing approximately 180 pounds. The similarities between these two descriptions weigh against their singularity.[32] Otero described a third person, who he did believe was directly involved, as a black female, age twenty-three to twenty-four years old, five feet, three inches tall and approximately 120 pounds.

Rousseau testified that, at the hospital, Otero told him that he did not think that he could identify any of his attackers. We know from the record that, at the time of the attack Otero was thirty-six years old, and so he was describing the two males who attacked him as eight to nine years younger than he was. We know, as well, from the record, that, on February 15, 2008, the defendant was thirty-seven years old, or nine to ten years older than the assailant initially described by

[32] Although *Manson* v. *Brathwaite*, supra, 432 U.S. 114–16, does not list uniqueness of description as a factor in its nonexclusive list of factors to be considered in assessing admissibility, logic and human experience suggest that the uniqueness of a description may have some bearing on the question of reliability. For example, if a person has a distinct feature, uncommon in the general population, identification of that feature present in a suspect would tend to lend reliability to the identification. On the other hand, if the description fits a substantial category of individuals, it is less useful as a guide to reliability. In this instance, the description of the three individuals includes no indicia of uniqueness and, as noted, the descriptions of the two men were, in general, similar. This is not to say that when a description lacks unique characteristics it is inherently unreliable. Finally, we note that at some point Otero claimed that one of the men had freckles on his face. The record is devoid of any information as to whether that facial feature is unique or common in the subject population, and, unlike the dissent, we cannot conclude that either the prevalence or rarity of men with freckled facial complexions is a matter of common knowledge or common sense.

Otero on the day of the incident. While, in other respects, Otero's description of his initial assailant appears to be consistent with the defendant (as well as with the other male who is described), we do not have, from the record, any reference data with which to draw any conclusions regarding the relative distinctiveness of the assailant's description.

## D

### The Level of Certainty Demonstrated at the Confrontation

This factor warrants little discussion because, at the time of the confrontation, Otero was told, and not asked, by Bilbo that the photograph he was being shown was that of the defendant and that the defendant was a suspect in the case whose arrest Bilbo was seeking. We know, as well, that before this procedure, Otero had heard from "[s]econd, thirdhand" sources that the defendant had been involved in the altercation and that Otero, in fact, had relayed the defendant's name to the police. Therefore, Otero went to the police department with the defendant in his mind as one of the assailants, a belief that immediately was buttressed by Bilbo's confirming to him that the defendant was a suspect whose arrest he was in the process of seeking.[33] Thus, while the record is clear that Otero testified in court that, upon seeing the photograph of the defendant he identified him, with certainty, as his initial assailant, little weight should be accorded to Otero's level of certainty,

---

[33] As noted by Justice Richard N. Palmer's concurrence in *Outing*, social science research has demonstrated that "a witness may develop unwarranted confidence in his or her identification if he or she is privy to postevent or postidentification information relating to the event or to the identification . . . ." *State* v. *Outing*, supra, 298 Conn. 106–107. It does not appear from the record that the trial court gave any consideration to Otero's personal investigation of this matter leading to his discovery of the defendant's name and his realization that the defendant was (then) incarcerated when assessing Otero's level of confidence in his identification of the defendant.

given the prelude to the photographic identification.[34] The trial court, however, appears to have given great weight to this factor. In placing on the record its reasons for denying the motion to suppress, the court stated: "Most significantly and as is apparent from much of the foregoing, the level of certainty of Mr. Otero's identification of the accused was exceedingly high." Similarly, with regard to the in-court identification, the court observed: "With respect to his in-court identification of the defendant at the evidentiary hearing on this motion, [Otero] expressed or displayed absolutely no uncertainty, hesitation, or equivocation. In my view, Mr.

[34] In weighing this criterion, we are mindful that studies conducted since *Manson* and decisional law have cast doubt on the correlation between certainty of identification and accuracy. See A. Bradfield, G. Wells & E. Olson, "The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy," 87 J. Applied Psychol. 112 (2002); G. Wells & A. Bradfield, " 'Good, You Identified the Suspect': Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience," 83 J. Applied Psychol. 360 (1998); G. Wells, M. Small, S. Penrod, R. Malpass, S. Fulero & C. Brimacombe, "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," 22 L. & Hum. Behav. 603, 635 (1998) ("confidence statements from eyewitnesses can be affected dramatically by events occurring after the identification (postidentification events) that have nothing to do with the witness's memory"); see also G. Wells, A. Memon & S. Penrod, "Eyewitness Evidence: Improving Its Probative Value," 7 Psychol. Sci. in the Pub. Int. 2, 65 (2006) ("[t]hough confidence-accuracy correlations are sometimes relatively high, most research yields relatively low correlations"); K. Deffenbacher, "Eyewitness Accuracy and Confidence: Can We Infer Anything About Their Relationship?" 4 L. & Hum. Behav. 243 (1980); R. Lindsay, G. Wells & C. Rumpel, "Can People Detect Eyewitness-Identification Accuracy Within and Across Situations?" 66 J. Applied Psychol. 79, 80–82 (1981); *State* v. *Henderson*, supra, 208 N.J. 236 ("[i]ndeed, this Court has already acknowledged that accuracy and confidence may not be related to one another at all"); *State* v. *Long*, supra, 721 P.2d 490 ("[r]esearch has also undermined the common notion that the confidence with which an individual makes an identification is a valid indicator of the accuracy of the recollection").

Suffice to say, it is doubtful that much reliance should be placed on the certainty of a witness who has been told repeatedly by associates in the community and then by the police that an individual was involved in the assault upon him before being shown that individual's photograph while simultaneously identifying him by name and as a suspect about to be arrested in connection with the offense under investigation.

Otero's level of certainty was, as stated, very high." That the court relied considerably on this factor is self-evident from the record. Equally evident from the volumes of social science research on this factor is the lack of any correlation between a victim's level of confidence in his or her identification and its accuracy.

E

The Time Between the Crime and the Confrontation

The next consideration relates to the timing of the identification. As noted, by June, 2008, following the February, 2008 incident, Bilbo was in possession of a photographic array that included a photograph of the defendant. Otero, however, was not shown the array, and instead, he was shown a single photograph of the defendant months later.[35] In *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), while not finding that the lapse of time between a criminal event and a subsequent identification procedure required exclusion of the identification evidence, the United States Supreme Court nevertheless expressed the view that a lapse of seven months between the date of a crime and a subsequent confrontation "would be a seriously negative factor in most cases." Id., 201.

---

[35] The timing of Bilbo's display of the defendant's photograph to Otero was confused at trial. Although Otero testified to his belief that he was shown this photograph in May, 2008, on the same day that he was shown a photographic array that did not include a photograph of the defendant, Bilbo testified that he showed the photograph of the defendant to Otero six or seven months later. While not drawing any conclusion as to the exact date on which Bilbo first showed Otero a photograph of the defendant, and although acknowledging that the time between the assault and the single photograph identification "might be viewed as inordinate," the court dismissed the significance of this factor in light of Otero's opportunity to view his assailant and the level of certainty of his identification. Thus, the court appears to have dismissed this factor as relatively insignificant. Most importantly, because the court did not make a factual finding as to when the defendant's photograph was shown to Otero, it was not in a position to assess this factor fairly.

.

The New Jersey Supreme Court, in a recent opinion, fashioned a protocol for police identification procedures. The court observed: "Memories fade with time. And as the [s]pecial [m]aster observed, memory decay 'is irreversible'; memories never improve. As a result, delays between the commission of a crime and the time an identification is made can affect reliability. That basic principle is not in dispute." *State* v. *Henderson*, supra, 208 N.J. 267. The court continued: "A meta-analysis of fifty-three 'facial memory studies' confirmed that memory strength will be weaker at longer retention intervals [the amount of time that passes] than at briefer ones. . . . In other words, the more time that passes, the greater the possibility that a witness' memory of a perpetrator will weaken. . . . However, researchers cannot pinpoint precisely when a person's recall becomes unreliable." (Citations omitted.) Id. Suffice to say, a delay of months between the date of the offense and the presentation of the defendant's photograph to Otero is not an indicator of reliability. Finally, because the court did not make a factual finding as to when the defendant's photograph was shown to Otero, it was not in a position to assess this factor fairly. Rather, the court appears to have dismissed this factor as unimportant in light of other indicia of reliability it found.

At trial, the court's assessment of reliability required a balancing analysis. Now, we, too, must do so on review of this mixed question of law and fact.[36] Our review of the record suggests, however, that although the court assessed some of the factors listed in *Manson* v. *Brathwaite*, supra, 432 U.S. 114–16, in its reliability determination, it failed to give proper weight to the corrupting

---

[36] Because the determination of reliability involves a mixed question of fact and law, our review is plenary. *State* v. *Outing*, supra, 298 Conn. 50. In conducting this review, however, we defer to the court's primacy in determining the subordinate facts, "unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *St. John*, 282 Conn. 260, 277, 919 A.2d 452 (2007).

effect of this most inappropriate identification confirmation procedure. In weighing those factors, the trial court gave inappropriate weight to Otero's level of certainty while dismissing, as insignificant, the internal and external circumstances of the assault regarding Otero's condition during the melee and the impact Otero's own investigation of the assault may have had on his readiness to confirm that the photograph shown to him by Bilbo was that of the defendant. Additionally, by not establishing the date or month on which the identification was made, the court failed to consider the impact of such a delay on Otero's ability to identify his initial assailant accurately.

Contrary to the finding by the trial court, our application of the factors listed in *Manson* v. *Brathwaite*, supra, 432 U.S. 114–16, considered against the backdrop of the extraordinarily overbearing manner of the identification procedure, leads us to the conclusion that the pretrial identification of the defendant by Otero was not reliable and that Otero's subsequent in-court identification was not sufficiently removed from the taint of the earlier out-of-court identification to be independently reliable. We conclude, therefore, that both identifications should have been suppressed as unreliable.

We turn now to the question of harm. At the outset, we note that our Supreme Court has, as a matter of policy, emphatically rejected the notion that the doctrine of harmless error is available to uphold a conviction in which the trial court admitted unnecessarily suggestive and unreliable witness identification testimony. *State* v. *Gordon,* supra, 185 Conn. 419–20. In *Gordon,* the court opined: "The state urges that even if the trial court erred in admitting both the station house and the in-court identifications of the defendant by the victim, such error would be harmless because of other overwhelming evidence that the defendant was the assailant." Id., 419. Rejecting this argument, the

court stated: "Ordinarily the burden of establishing that harm resulted from a trial court error rests on the appellant. . . . However, there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error. . . . If error touches a less basic constitutional right, we sometimes apply the harmless error exception, but only sparingly, in a few, discrete circumstances. . . . Thus, we refuse to expand our harmless constitutional error doctrine to the discrete circumstances of unnecessarily suggestive and unreliable identifications, the admission of which significantly impairs the truth finding function of the jury. . . . Were we to do so we would fail to correct negligent infractions of constitutional rights and tempt some public officials to overstep the law in their zeal to convict the guilty. Some would yield to such temptation. The devastating nature of both negligently and deliberately obtained, unreliable eyewitness identifications would inevitably lead to the conviction of innocent persons. Hence sound judicial policy requires reversal whenever the erroneous admission of an unnecessarily suggestive and unreliable identification has violated a defendant's constitutional rights."[37] (Citations omitted; internal quotation marks omitted.) Id., 419–20.

---

[37] The state attempts to avoid the holding of *Gordon* by asserting that *Gordon* was tacitly overruled in *State* v. *Milner*, 206 Conn. 512, 536 n.11, 539 A.2d 80 (1988). We do not agree. While *Milner* did involve a claim regarding eyewitness identification, the court, on review, determined that the pretrial identification procedure was not unnecessarily suggestive. Therefore, the *Milner* court noted that the trial court was not required to assess the reliability of the witness identification. To be sure, and as pointed out by the dissent, there is a footnote in *Milner* suggesting that even if the court had improperly admitted the disputed identification testimony, it would be harmless error because of other very persuasive evidence of the defendant's guilt. Contrary to the state's assertion and unlike the dissent, we are not prepared to conclude that a footnote in dicta on an issue with little procedural parallel to *Gordon* can fairly be read as tacitly overruling the precedent *Gordon* established. Similarly, and unlike the state or our dissenting colleague, we are not emboldened to dismiss *Gordon* either as an outlier or as no longer viable. In claiming that we should do so, the dissent fails to honor the bedrock principle that, as an intermediate court,

Our Supreme Court recently has stated: "When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the

we are bound by Supreme Court precedent and not at liberty to dismiss it as outdated. See *State* v. *Smith*, 107 Conn. App. 666, 684–85, 946 A.2d 319 (It is axiomatic that this court is "bound by Supreme Court precedent and [is] unable to modify it . . . . [W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." [Citations omitted; internal quotation marks omitted.]), cert. denied, 288 Conn. 902, 952 A.2d 811 (2008).

To be sure, neither we nor the dissent have been able to find any other cases in which *Gordon* has been overruled or where the court has ruled in a manner inconsistent with *Gordon*'s holding. To the contrary, the court, in *State* v. *Perez*, 198 Conn. 68, 502 A.2d 368 (1985), specifically affirmed its commitment to *Gordon*. In *Perez*, the court observed: "In resolving this case without reaching the issue of harmless error, we are not signaling any retreat from the holding of *State* v. *Gordon*, 185 Conn. 402 . . . ." *State* v. *Perez*, supra, 72 n.3. It is of some interest that while *Gordon* was a three-two split decision, *Perez* was unanimous. Later, this court specifically cited *Gordon* in its discussion of the genesis and scope of harmless error. See *State* v. *Patterson*, 31 Conn. App. 278, 300–301, 624 A.2d 1146 (1993) (noting that, while historically, harmless error analysis was available for constitutional errors of relatively minor proportion, the United States Supreme Court and our Supreme Court have found some constitutional rights so basic that their violation could not be made subject to harmless error analysis; included in this list was our Supreme Court's holding in *Gordon*), rev'd on other grounds, 230 Conn. 385, 645 A.2d 535 (1994).

Finally, on this point, the dissent suggests, as a reason for not following *Gordon*'s precedent, that no other jurisdiction has followed *Gordon* and that harmless error is available for all but structural constitutional principles. From a constitutional perspective, we do not disagree. As noted by the dissent, the United States Supreme Court, in *Arizona* v. *Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), in a split decision, embraced the application of harmless error review to coerced confessions. The dissent fails to recognize, however, that *Gordon* does not rest on constitutional principles, but, rather, it is based on policy. As a formulation of policy for Connecticut, *Gordon* is no less binding on this court than an opinion of constitutional magnitude.

Furthermore, in the cases we have reviewed, the issue confronted in *Gordon* and which we now face has not been reached because the reviewing court has held either that the pretrial identification procedure was not unnecessarily suggestive; see *State* v. *Holliman*, 214 Conn. 38, 49, 570 A.2d

trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 307, 25 A.3d 648 (2011).

In analyzing harm in other constitutional contexts, our Supreme Court has also opined: "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the

680 (1990) ("[s]ince we conclude that the identification procedure was not unnecessarily suggestive, we will not gratuitously lengthen this opinion by considering the reliability of the resulting identification"); *State* v. *Perez*, supra, 198 Conn. 74 ("[t]he conduct of the police . . . was not, under these circumstances, independently suggestive"); or that, even if it was suggestive, the identification was nevertheless reliable. See *State* v. *Figueroa*, supra, 235 Conn. 160 ("[w]e conclude that the trial court reasonably could have found, from the totality of the circumstances, that the victim's . . . identification of the defendant was sufficiently reliable to be admissible"); *State* v. *Wooten*, supra, 227 Conn. 687 ("[e]ven if the victim's out-of-court identification [was] unnecessarily suggestive, however, the identification in this case was nonetheless reliable under the totality of the circumstances").

Accordingly, on the basis of our review of decisional law, while the case at hand may present, perhaps, the first circumstance in which *Gordon*'s holding is directly applicable, we find no support for the notion that the holding of *Gordon* should be discarded on the ground that the strong policy it enunciates has been eroded by the passage of time or by new information that yields misidentification testimony less of a concern to the criminal justice process. To the contrary, over the intervening decades the increased awareness of the impact and yet fallibility of eyewitness identification has been brought to light through widely accepted research and significant improvements in DNA analysis. These developments would appear to suggest the need for more heightened safeguards regarding witness identification procedures and not a relaxing of the court's tolerance for improper police procedures.

overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . *If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001).[38]

The relationship between properly admitted evidence and improperly admitted evidence implicating a constitutional right is significant to our analysis. While consideration of both the good and bad evidence is appropriate, the properly admitted evidence has to be beyond strong in order to uphold a conviction. In *State* v. *Angel T.*, 292 Conn. 262, 277 n.10, 973 A.2d 1207 (2009), our Supreme Court described the nexus between the proper and improper trial evidence in this manner: "This is not a situation where the case against the defendant was otherwise 'so overwhelming' that the constitutional error did not, beyond a reasonable doubt, contribute to the conviction." In a similar vein,

[38] In suggesting that, perhaps, harmless error analysis should be available in cases in which there is more than one eyewitness, the dissent appears to be conflating the nature of harmless error analysis with whether such an analysis is appropriate in the first place. Obviously, if harmless error is available in all situations involving the admission of an unnecessarily suggestive and unreliable identification procedure, the presence of other eyewitness testimony would tend to make the one faulty identification less crucial to the state's case. But that observation concerns the process of such an analysis. Indeed, the *Gordon* court found that the evidence of the defendant's guilt was substantial. That conclusion, contrary to the dissent's implication, does not render specious the Supreme Court's policy of not affirming convictions involving the admission of unreliable and unnecessarily suggestive identifications. Therefore, and contrary to the dissent's claim, application of the policy enunciated in *Gordon* is not absurd. Indeed, the availability of overwhelming admissible evidence of a defendant's guilt should, in prudence, eliminate the proffer of inadmissible evidence and should also discourage law enforcement from procedures that jeopardize fundamental constitutional rights. If such a policy is to be deemed absurd, that conclusion is not ours to make.

in *State* v. *Gerardi*, 237 Conn. 348, 677 A.2d 937 (1996), a case involving a constitutional error unrelated to identification, our Supreme Court stated: "[W]e cannot conclude with any degree of certainty that the evidence adduced at trial was so overwhelming that it foreclosed the possibility that the jury may have relied upon the improper mandatory presumption regarding possession rather than upon that evidence." Id., 363. Additionally, in *State* v. *Gonzalez*, supra, 302 Conn. 310, our Supreme Court, adjudicating a claim of improper admission of a statement by the defendant, concluded that the evidence against the defendant was "not so overwhelming that we are convinced beyond a reasonable doubt that the admission of his improperly obtained narration was harmless." Thus, the state can not prevail in a harmless error analysis simply by demonstrating that the properly admitted evidence, absent the tainted evidence, was merely adequate for a conviction. Id., 306–307.

Even though we are persuaded that the legal posture of the case at hand is indistinguishable from *Gordon*, we conduct a harmless error analysis. At the outset, we note that the state's case against the defendant was not overwhelming. To the contrary, there was no physical evidence at the scene, nor was there any forensic evidence. No knife or any dangerous instrumentality was found at the crime scene or connected to this incident, and there were no statements from the defendant. Rather, the state's evidence consisted, mainly, of the testimony of Otero and Miano. The state's additional witnesses, with one exception, were all police officers whose information, in large measure secondhand, came from Otero and Miano. The one witness for the state who was not a police officer, Rego, an employee of Club Blu, testified regarding the physical layout of the scene and the injury to Otero's thumb and stomach, evidence that did not, in any manner, implicate the defendant.

As to Miano, a fair review of her testimony reveals that she stated that the defendant traveled with her and others to and from the area of the altercation on the night in question. She placed the defendant at the scene of the altercation and as a participant. However, her testimony regarding the circumstances of the altercation was confused and imprecise, her ability to observe the events accurately was unclear, and her familiarity with Otero together with her relationship with Robert Acevedo reasonably could have put her objectivity in doubt for the fact finders.

Furthermore, Miano testified that she, together with the defendant and two others, Robert Acevedo and Anna Acevedo,[39] arrived at Club NV at approximately 11 p.m. While at Club NV, Miano did not see the defendant although she did spend time with Otero, giving him a hug, having him take a photograph of her with her camera and later exchanging contact information with him while leaving. Significantly, Miano acknowledged that, by the time she left the club, she was "tipsy" after having consumed two to three "[s]ex on the beach" mixed drinks containing vodka.

As to the altercation itself, Miano acknowledged that when she, Robert Acevedo and Anna Acevedo got into the automobile, she was uncertain of the defendant's whereabouts and was unsure as to whether the defendant had gotten into the automobile before the altercation took place. Although Miano asserted that the defendant was present during the altercation and that she saw one of the two men push the other, she also acknowledged that she did not see the argument that she claimed occurred between the defendant and Otero, or the physical altercation that she claimed took place

---

[39] Miano testified that Robert Acevedo drove the four of them to the club in Hartford in his silver Infiniti automobile. Robert Acevedo was the boyfriend of Miano at the time of the incident, and Anna Acevedo is Robert Acevedo's sister.

between them.[40] Additionally, although Miano testified on direct examination that she saw blood on the defendant's shirt after the altercation, she admitted on cross-examination that she had not, in fact, seen any blood on the defendant. We acknowledge that Miano testified that earlier in the evening the defendant had indicated that he had wanted to leave his knife in the automobile before going into Club NV and that, although Miano's testimony regarding the actual altercation was confused and inconsistent, she placed the defendant at the site of the altercation as a participant. From this testimony, the jury reasonably could have concluded that the defendant was a participant in the assault that resulted in Otero's injuries.

Additionally, from our review of Miano's testimony, we acknowledge that the jury could have resolved any credibility and impartiality issues in favor of believing her testimony and could have drawn reasonable inferences from it, and, on that basis alone, the evidence may have been sufficient to sustain the jury's guilty verdict. Our conclusion that the jury could have found the defendant guilty on the basis of Miano's and other properly admitted testimony should not, however, be equated with a finding that the properly admitted evidence of the defendant's guilt was so overwhelming that we can determine, beyond a reasonable doubt, that it was not a factor in the jury's verdict. Indeed, the state's evidence was far from overwhelming.

As noted, harmlessness must be analyzed in context. Thus, in order to affirm the judgment, we must be able to declare that, in light of the properly admitted evidence, the improperly admitted evidence could not have

---

[40] Miano's testimony about the initial pushing between the defendant and Otero is somewhat muddled. Initially, she stated that she saw the defendant push Otero, but later she stated that Otero pushed the defendant. Elsewhere, as noted, Miano indicated that she did not see the altercation between the two.

affected the jury verdict. *State* v. *Gonzalez*, supra, 302 Conn. 306–307. This is particularly true in a situation involving eyewitness identification. As Justice William J. Brennan, Jr., of the United States Supreme Court observed: "[D]espite its inherent unreliability, much eyewitness identification evidence has a powerful impact on juries. Juries seem most receptive to, and not inclined to discredit, testimony of a witness who states that he saw the defendant commit the crime. [E]yewitness testimony is likely to be believed by jurors, especially when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all. All the evidence points rather strikingly to the conclusion that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says That's the one!" (Internal quotation marks omitted.) *Watkins* v. *Sowders*, 449 U.S. 341, 352, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981) (Brennan, J., dissenting). With implicit agreement, our Supreme Court has noted: "Common sense suggests, and research confirms, that eyewitness identification is an important form of evidence." *State* v. *Ledbetter*, supra, 275 Conn. 575. Additionally, the court observed: "Eyewitness identification evidence is particularly persuasive when the witness exhibits confidence in the identification." Id.

The point made by Justice Brennan and echoed by Justice Richard N. Palmer in his concurrence in *State* v. *Outing*, supra, 298 Conn. 105; see footnote 29 of this opinion; was surely not lost on the prosecutor in the case at hand. A review of closing arguments reveals that the prosecutor began his argument to the jury by emphasizing Otero's identification of the defendant, going to the extent of asking the jury to accept, as credible, Otero's identification testimony against the testimony of Bilbo that Otero had not made a pretrial

identification. Indeed, in urging the jury to accept Otero's identification of the defendant as accurate, the prosecutor argued: "Don't blame Mr. Otero for the indifference and the incompetence of the Hartford police department." The prosecutor's argument to the jury regarding Otero's identification was neither brief nor incidental. Furthermore, despite Bilbo's claim that Otero had not identified the defendant when shown his photograph in December, 2008, and in light of Otero's testimony to the contrary, the court charged the jury that the state had presented both out-of-court and in-court identification testimony and gave a lengthy charge on the topic of eyewitness identification. Thus, it cannot reasonably be said that Otero's identification testimony was insignificant to the state's presentation or to the court's instructions to the jury. Indeed, from a fair reading of the transcript, it appears that Otero's out-of-court and in-court identifications of the defendant were key elements, if not the centerpiece, of the state's case.

On the basis of our review of this record, we are persuaded that there is no reasonable basis to conclude that the jury was not likely influenced by Otero's improperly admitted out-of-court and in-court identifications of the defendant. We conclude, therefore, that, to the extent the improper admission of unreliable identification evidence is subject to harmless error analysis on appeal, the state has not met its burden of demonstrating beyond a reasonable doubt that the court's incorrect admission of Otero's identifications of the defendant constituted harmless error.

The judgment is reversed and the case is remanded for a new trial.

In this opinion PETERS, J., concurred.

LAVINE, J., concurring in part and dissenting in part. I agree with the majority that the trial court properly

denied the motion for a judgment of acquittal, postverdict, filed by the defendant, Troy Artis, as to the charge of accessory to assault in the first degree by means of a dangerous instrument and, therefore, join in part I of the majority opinion. Because I believe that the trial court did not abuse its discretion in admitting the victim's identification of the defendant and that, even if it did, such error was harmless beyond a reasonable doubt, I respectfully dissent from the remainder of the majority opinion.

I

RELIABILITY OF THE VICTIM'S IDENTIFICATIONS

I do not believe that the trial court abused its discretion in admitting the victim's out-of-court and in-court identifications as reliable, even though the identification procedure was unnecessarily suggestive. The record adequately supports the subordinate facts found by the court in its meticulous and nuanced oral decision. Additionally, in accordance with the reliability factors set forth in *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), and the totality of the circumstances, the defendant has not met his burden of showing that the court's ultimate conclusion was unreasonable.

The standard of review governing the admissibility of an out-of-court identification is well settled. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined

whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, *the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect.* . . .

"Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 547–48, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). "The exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 159–60, 665 A.2d 63 (1995); see also *Manson* v. *Brathwaite*, supra, 432 U.S. 116; *State* v. *Outing*, 298 Conn. 34, 60–61, 3 A.3d 1 (2010) ("At a suppression hearing, a court is required only to determine the due process question of whether the eyewitness identifications are so lacking in reliability

as to be inadmissible. . . . Thus, the trial court serves a constitutional gatekeeping function rather than as finder of fact making a credibility assessment of the eyewitness." [Citations omitted; internal quotation marks omitted.]), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

The majority largely ignores the findings of the trial court and substitutes its judgment in place of the court's findings. Contrary to the majority's conclusion that many of the court's findings were clearly erroneous, I believe that they are adequately supported by the record. See *State* v. *Wheat*, 52 Conn. App. 115, 116, 725 A.2d 993 ("[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses" [internal quotation marks omitted]), cert. denied, 249 Conn. 901, 732 A.2d 777 (1999); see also *State* v. *Sanchez*, 128 Conn. App. 1, 9 n.4, 15 A.3d 1182 ("[w]e must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude" [internal quotation marks omitted]), cert. granted on other grounds, 301 Conn. 919, 21 A.3d 465 (2011). Although appellate courts reviewing the reliability of identification evidence "defer less than [they] normally do to the . . . fact finding of the trial court"; (internal quotation marks omitted) *State* v. *Marquez*, 291 Conn. 122, 136 n.13, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009); this court cannot "disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 548. In my view, such clear and manifest error did not occur in this case.[1]

---

[1] It is important to remember that the trial court's findings only were for the purpose of ruling on the defendant's *motion to suppress* the victim's identifications. After a trial court makes the threshold determination of

"[R]eliability is the linchpin in determining the admission of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) Id., 553. Our Supreme Court recently held that this standard, originally derived from *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and reaffirmed in *Manson* v. *Brathwaite*, supra, 432 U.S. 114, applies under both the federal and state constitutions. *State* v. *Ledbetter*, supra, 275 Conn. 559–60, 568–69.

## A

## The Victim's Opportunity to Observe the Assailant

Regarding the first reliability factor, the victim's opportunity to observe the assailant at the time of the crime, the court found that there was sufficient lighting for the victim to observe the defendant's face. As noted

reliability, it is ultimately up to the jury to make credibility assessments, weigh the evidence and decide, on its own, whether the identification was sufficiently reliable. See *State* v. *Outing*, supra, 298 Conn. 60–61; *State* v. *Morgan*, 274 Conn. 790, 802, 877 A.2d 739 (2005). Indeed, in this case, the trial court provided extensive jury instructions on the factors to consider, including the *Manson* reliability factors, in determining the reliability of identification evidence. The court then explained: "You must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crimes charged or you must find the defendant not guilty. If you have a reasonable doubt as to the accuracy of the identifications, you must find the defendant not guilty." It is well established that "[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 485, 832 A.2d 626 (2003).

by the majority, Jose Rivera, a Hartford police officer, testified that, in his experience, the area where the incident occurred is well lit. Hector Robles, another Hartford police officer, testified that he saw a scuffle, which included two women in red minidresses, from approximately 150 feet away and that, after breaking up the fight, three people entered a newer model gray Infiniti automobile and drove away. Later in the evening, Robles discovered a trail of blood splatter, which he followed "down to the northeast corner of High and Allyn" Streets in Hartford near the site of the altercation at issue. Robles' ability to observe both the scuffle from 150 feet away and the trail of blood supports the court's finding that the area was sufficiently well lit for the victim to see the defendant's face. Additionally, as explained by the trial court, the victim's ability to observe the make and color of the car and his ability to describe the assailant's face as freckled "is also indicative of sufficient opportunity and illumination to observe from a slight distance of at most a few feet." Therefore, there is clearly adequate support for the court's finding that there was sufficient lighting for the victim to observe the defendant's face.

The court also found, as to the first factor, that the victim "had a couple of beers" over the period of an hour and one-half and that there was no evidence that the victim's "capacity to observe was in any way impaired or diminished during the incident due to alcohol." Although the first portion of this finding, which was that the victim only "had a couple of beers," may well be clearly erroneous, the second portion, regarding the victim's capacity to observe, is not. The majority accurately points out that, contrary to the court's finding, the victim testified that he had "[a]t least four" beers on the night in question.[2] The trial court was

---

[2] The victim initially testified that he only had "[a] couple beers." In light of his subsequent clarification, however, it seems probable that he had at least four beers.

correct, however, that there was no evidence that the victim's alcohol consumption impaired his capacity to observe. Jeff Rousseau, a Hartford police sergeant, testified that when he visited the victim at Hartford Hospital shortly after the incident, he could not detect the odor of alcohol on the victim's breath. Additionally, the victim testified that he weighed approximately 250 pounds at the time of the incident. Therefore, despite the likely error in finding that the victim consumed only "a couple of beers" that night, the court's finding that the alcohol did not impair his ability to observe is supported adequately by the record. See *State* v. *Ledbetter*, supra, 275 Conn. 556 (trial court found "evidence did not indicate that [victim] was inebriated or that his ability to observe was impaired in any way"). In any event, the difference between two beers and four beers is almost certainly of limited significance given the circumstances of this case.

## B

### The Victim's Degree of Attention

Regarding the second factor, the victim's degree of attention, the court found that the victim "got a good hard look at his assailant." The court cited the evidence that the victim provided a description of the assailant's freckles, which "confirms that his concentration was on the perpetrator's face . . . ." The court also cited the evidence that "the victim and the other person were face to face at a very slight distance from one another [in] a fistfight, arm's length apart." Therefore, according to the court, the evidence "clearly establishes that the victim's concentration was on and directed toward the face of the person with whom he was fighting."

The majority, however, asserts that the court "made no explicit determination of the length of time [the victim] and his assailant were face-to-face" and "substantially compressed the time period in which a victim

may be found to have a 'good hard look.' " I disagree. I believe that the court found that the victim and his assailant were face to face for a period of five to ten seconds.[3] I also believe that this time period was not too brief to render the court's finding that the victim had a "good hard look" at the defendant clearly errone-ous. In fact, many of the witnesses in reported "fleeting glance" cases actually have had a worse opportunity to view the assailants than did the victim in this case. See, e.g., *State* v. *Piskorski*, 177 Conn. 677, 739, 742–43, 419 A.2d 866 (witness observed, from inside moving car on opposite side of street, assailant inside lighted building "for a matter of seconds"), cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979), super-seded by statute on other grounds as stated in *State* v. *Canady*, 187 Conn. 281, 283–84, 445 A.2d 895 (1982); *State* v. *Cubano*, 9 Conn. App. 548, 553, 520 A.2d 250 (1987) (witness "had the opportunity to observe [assail-ant] from five to ten seconds from a distance of about ten feet");[4] *State* v. *Tate*, 9 Conn. App. 141, 146, 516 A.2d 1375 (1986) (witness viewed assailant from twenty-five feet away for "a few seconds" but could not describe his face). In contrast, and as noted by the trial court, the victim in this case was no more than arm's length away from the defendant and was looking directly at his face.

The majority further asserts that the incident lasted only "a few seconds . . . in the context of a heated verbal exchange during which [the victim] was struck twice by his assailant, in the shoulder and facial area, and during which [the victim] struck the assailant two

---

[3] The court stated: "*It is recognized* that the defendant's viewing of his opposing combatant was very brief, according to [the victim]—a duration of five or ten seconds." (Emphasis added.) The court also stated, earlier in its oral findings, that "[p]unching continued for approximately ten seconds."

[4] *State* v. *Cubano*, supra, 9 Conn. App. 548, should not be confused with *State* v. *Cubano*, 203 Conn. 81, 523 A.2d 495 (1987). Both cases involved the same defendant and similar factual circumstances but separate incidents.

times," and that, in light of the stress of the incident, the accuracy of the victim's observation and recall was compromised. This court, however, is not permitted to engage in speculation or fact-finding. Because "a trial court is far better equipped than this court to make" factual determinations; (internal quotation marks omitted) *State* v. *Ledbetter*, supra, 275 Conn. 548; I do not believe that the circumstances cited by the majority warrant the conclusion that the trial court's finding that the victim had a good, hard look at the assailant's face was clear error.[5]

## C

### Accuracy of the Victim's Prior Description of the Assailant

As to the third factor, the accuracy of the victim's prior description of the assailant, the court found that the description given to Rousseau "was entirely accurate with reference to race, gender, height . . . and weight." The court also stated: "Based on my observation of the defendant in the course [of] trial . . . the description, 'a stocky build,' was entirely accurate." Moreover, the court explained, "most importantly, the victim did describe the one salient, distinguishing facial feature, a freckled face."[6]

---

[5] The majority also cites "the conflicting testimony regarding the location of the assailant immediately before the incident" as "erod[ing] confidence in the accuracy of [the victim's] observations at the moment." I do not agree. Trial courts often are tasked with sorting through conflicting testimony to reach factual conclusions. See *State* v. *Jimenez*, 73 Conn. App. 664, 668, 808 A.2d 1190 ("[i]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony" [internal quotation marks omitted]), cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). Therefore, the conflicting testimony regarding the location of the defendant prior to the assault, in my view, is not sufficient to render the court's finding that the victim had a good, hard look at the defendant clearly erroneous.

[6] The court noted that "there was no evidence that the defendant had any other conspicuous features, facial or otherwise, that would or should have been noticed in these circumstances: tattoos, scars—dental abnormalities, et cetera. And similarly, there was no evidence [that the defendant] customarily

The majority states that the victim's description "includes no indicia of uniqueness" because "[t]he record is devoid of any information as to whether [having freckles] is unique or common in the subject population . . . ." The majority's assertion is accurate but beside the point. "[Triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand . . . ." (Internal quotation marks omitted.) *State* v. *Rosario*, 113 Conn. App. 79, 88–89, 966 A.2d 249, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009). It was well within the trial court's discretion to take note of the freckles as a distinguishing characteristic. Therefore, in my view, the record provides adequate support for the court's finding that the victim's description was accurate and that the victim described "the one salient, distinguishing facial feature . . . ."

## D

### Level of Certainty Demonstrated at the Identification

Regarding the fourth factor, the level of certainty,[7] the court found that the victim's level of certainty of the

[wore] any distinctive attire or jewelry, scarf, bandana, gold chain, earring, et cetera."

[7] I recognize that our Supreme Court and the high courts of our sister states have considered the growing body of scientific knowledge regarding the ability of an eyewitness to recall events and that the area of eyewitness identification is undergoing some long overdue and much-needed reevaluation. See Eyewitness Identification Task Force, state of Connecticut, Report Pursuant to Public Act 11-252, § 2 (February 8, 2012) available at http://www.cga.ct.gov/jud/eyewitness/docs/Final%20Report.pdf (last visited February 21, 2012) (recommending mandatory sequential rather than simultaneous presentation of photographic arrays using double-blind procedure or, if not practicable, blind procedure); Substitute House Bill No. 5501, February Sess. 2012 (adopting recommendations of eyewitness identification task force); Report on Bills Favorably Reported by Committee, Judiciary, House Bill No. 5501 (April 5, 2012). These courts have noted that a victim's degree of certainty may not be a valid predictor of reliability. See *State* v. *Ledbetter*, supra, 275 Conn. 566–69; see also *State* v. *Outing*, supra, 298 Conn. 102–107

"identification of the accused was exceedingly high." Although Hartford police Detective Jeremy Bilbo testified that the victim could not identify the individual in the photograph, the victim testified that *he stated*, after viewing the photograph, that the individual in the photograph "was the one that I had the altercation with." The victim also testified that he recognized instantly the individual in the photograph as the assailant. As explained by the court, the victim "testified repeatedly that he was face to face with the defendant at close proximity. When asked why he was able to identify [the defendant], he replied . . . 'cause we were face to face' . . . . [The victim] testified [that] he identified [the defendant] not . . . 'because he was the person who came up on the screen, but' . . . 'cause he's the person that assaulted me.' " The court found the victim credible as to his motivation to identify the actual assailant rather than simply having " 'just anyone arrested' . . . ."[8]

(*Palmer, J.,* concurring); *State* v. *Henderson,* 208 N.J. 208, 27 A.3d 872 (2011). In *Outing,* the issue was whether defendants may present *expert testimony* regarding the reliability of identifications. Additionally, in *Henderson,* the New Jersey Supreme Court modified that state's framework for evaluating eyewitness identification evidence under the New Jersey constitution. *State* v. *Henderson,* supra, 287 n.10 ("We have no authority, of course, to modify *Manson.* The expanded protections stem from the due process rights guaranteed under the State Constitution."). In *State* v. *Ledbetter,* supra, 569, however, our Supreme Court concluded that the scientific studies demonstrating a weak correlation between a victim's certainty and the accuracy of the identification were "insufficient to tilt the balance of the [*State* v. *Geisler,* 222 Conn. 672, 684–86, 610 A.2d 1225 (1992)] analysis in favor of the defendant" and, thus, declined to abandon the *Manson* factors under the state constitution. Therefore, at the present time, this court is still bound to employ the *Manson* factors, one of which is the witness' certainty.

[8] The victim was asked during cross-examination: "You wanted someone arrested for this. Right?" The victim responded: "Not just anyone, just justice." The court's credibility determination is also supported by the fact that the victim freely admitted when he could not identify individuals. The victim explained that during the investigation, also conducted by Bilbo, into an unrelated incident in which the victim was shot, he could not identify any individuals because he focused on the gun rather than the assailant's face. Additionally, after examining a photographic array containing Robert Acev-

The majority states that this factor "warrants little discussion because, at the time of the confrontation, [the victim] was told, and not asked, by Bilbo that the photograph he was being shown was that of the defendant and that the defendant was a suspect in the case whose arrest Bilbo was seeking." The corruptive influence of the suggestive procedure, although undoubtedly relevant to the ultimate determination of reliability, does not, under present law, negate the court's finding that the victim had a high level of certainty as to the identification. The trial court was in a better position to determine the credibility of the victim's testimony regarding his certainty; see *State* v. *Garcia*, 299 Conn. 39, 52–53, 7 A.3d 355 (2010); and this determination was not clearly erroneous.

E

Time between the Crime and the Identification

Regarding the last factor, the time between the incident and the identification, it is unclear what the court found as to the date of the identification. The victim and Bilbo gave contradictory testimony regarding when the identification procedure occurred. The victim stated that the identification occurred on May 28, 2008, whereas Bilbo stated that it occurred six or seven months after June 5, 2008, in the late fall or early winter of 2008. In its findings, the court recounted this contradictory testimony but never explicitly stated which date it found more credible.[9] Even assuming that the victim identified the defendant ten months after the incident, this fact would not change my conclusion that the victim's out-of-court identification was reliable.

edo's photograph, the victim told Bilbo that he could not identify anyone but that two photographs, one of which was Robert Acevedo's, looked most like an individual involved in the incident.

[9] The court did, however, find the victim's testimony more credible than Bilbo's as to whether the victim actually identified the defendant.

## F

### Ultimate Determination of Reliability

Certainly, there are valid reasons to question the reliability of the victim's identification, namely, the highly suggestive identification procedure, the nine year age discrepancy in the victim's description,[10] and, assuming that the court believed Bilbo's testimony, the approximately ten month gap between the incident and the identification. But see *State* v. *Mitchell*, 127 Conn. App. 526, 531, 537, 16 A.3d 730 (despite unnecessarily suggestive one-on-one show-up at crime scene, victim's identification was reliable), cert. denied, 301 Conn. 929, 23 A.3d 724 (2011); *State* v. *Sanchez*, supra, 128 Conn. App. 10–11 (even though victim described assailant as "young" but defendant was forty-two years old and identification occurred sixteen months after crime, victim's identification was reliable). As explained in *Ledbetter*, however, "[a]lthough some factors may have weighed against the reliability of the identification, the trial court gave adequate consideration to those factors in making its determination, and the defendant fails to satisfy his burden of establishing that the trial court abused its discretion in reaching that determination." *State* v. *Ledbetter*, supra, 275 Conn. 556. In light of the trial court's detailed and thoughtful findings, which are adequately supported by the record, I would uphold the court's ultimate determination of reliability because its conclusion was reasonable. Most importantly, as explained by the trial court, the victim's "observation of his assailant, while only for a few seconds, was from a distance of no more than a couple of feet, possibly just inches, while positioned face to face with the assailant,

---

[10] The court also noted that the victim's description did not include any clothing description. It explained, however, that prior to being hit from behind, the victim was focused directly on the assailant's face rather than on his clothing.

looking directly at his face, and there is no indication that the victim's eyesight was other than fully normal."

A comparison of the facts of this case to other Connecticut cases in which this court and our Supreme Court have concluded that the identification was sufficiently reliable supports the trial court's conclusion that the identification was reliable. In *State* v. *Ledbetter*, supra, 275 Conn. 534, which the trial court relied on in making its reliability determination, the facts are somewhat similar to this case. The attack at issue in *Ledbetter* occurred at night, but the area was well lit. Id., 553. The victim "had an opportunity to observe his assailants' faces . . . from a very close range," and, "although the struggle occurred over a matter of seconds, [the victim] looked at and focused on [the assailants'] faces." Id. Our Supreme Court explained that "a good hard look will pass muster even if it occurs during a fleeting glance"; (internal quotation marks omitted) id.; and, "the trial court specifically found that [the victim] got a good, hard look . . . at each of his two assailants . . . ." (Internal quotation marks omitted.) Id., 554. The victim had a high degree of attention on the assailants' faces. Id. "Although the description was general, [the victim] provided gender, race, approximate height, approximate weight, body type and that one of the assailants wore a hat. He also provided a description of the vehicle and the weapon used by the assailants." Id. Additionally, as argued by the defendant in *Ledbetter*, the victim "had been awake for approximately eighteen hours at the time of the incident and imbibed three to four and one-half ounces of alcohol earlier in the evening." Id., 555. The trial court found, however, "that the evidence did not indicate that [the victim] was inebriated or that his ability to observe was impaired in any way." Id., 556.[11]

---

[11] Other cases with arguably weaker indicia of reliability include *State* v. *St. John*, 282 Conn. 260, 919 A.2d 452 (2007), and *State* v. *Liptak*, 21 Conn. App. 248, 573 A.2d 323, cert. denied, 215 Conn. 809, 576 A.2d 540 (1990). In

Applying the *Manson* reliability factors and indulging "in every reasonable presumption in favor of the trial court's ruling"; (internal quotation marks omitted) *id.,* 548; I do not believe that the trial court abused its discretion in admitting the victim's out-of-court identification. I therefore also would uphold the court's conclusion regarding the admissibility of his in-court

*State* v. *St. John,* supra, 263, the witness was "walking her dog across the street when she suddenly heard loud voices coming from the direction of the gas station" between 9 and 9:30 p.m. She "looked over at the brightly lit station and saw a man come out of the convenience store, cross the island between the pumps and head in her direction before angling off to the right. . . . As he crossed the island, the man removed the mask, revealing the side of his face." Id. The trial court found that the witness "had a good opportunity to view the robber. The gas station was well lit, she was wearing her glasses and it was a clear day. Although she was about 100 feet away and initially had only a side view of the perpetrator, she was able to see him for a substantial enough period of time to obtain a good look." Id., 279–80. Additionally, "[a]lthough she was not 100 percent certain that the defendant was the robber, she indicated that the defendant and the robber were similar in appearance." Id. Our Supreme Court first concluded that the identification procedure was not unnecessarily suggestive but then concluded that, even assuming the procedure was unnecessarily suggestive, the identification was reliable. Id., 279, 280–81.

In *State* v. *Liptak,* supra, 21 Conn. App. 250, the witness initially observed, for six seconds, in his car's rear view mirror, an elderly woman being mugged in the parking lot of a bank. He only "saw the profile of the perpetrator, a man with a beard wearing very large, rounded, dark tinted sunglasses and a gray sweatshirt with the hood up." Id. After the perpetrator ran away and was out of sight, the witness drove around, looking "for someone running or walking away and saw no one, but noted a maroon car travelling ahead of him at the speed limit . . . . The car stopped at two stop signs. Both times, the driver of the car turned his head from side to side, enabling [the witness] to view his profile"; id.; which matched the profile he saw at the bank. Id., 251. The trial court suppressed the witness' out-of-court identification because he saw the back profile of a long haired, bearded man at the police station and was asked prior to the identification if he saw anyone who looked familiar. Id. The trial court, however, admitted the witness' in-court identification as nonetheless reliable. Id., 252. This court upheld the trial court's determination, explaining that the witness "had a good opportunity to view the crime," he was sure the vehicle he was following was driven by the defendant, he had a high degree of attention, and his description was accurate. Id., 253. This court also noted that "the in-court identification was not impermissibly distant in time from the incident itself. The trial took

identification. See *State* v. *Wooten*, 227 Conn. 677, 698, 631 A.2d 271 (1993) ("[g]enerally . . . conclusion that the victim's out-of-court identification of the defendant was constitutional would foreclose the defendant's argument that any subsequent in-court identification was inadmissible").

## II

## HARMLESS ERROR ANALYSIS

Even assuming that the trial court improperly admitted the victim's out-of-court and in-court identifications, I believe that harmless error analysis is available and that the court's error was harmless beyond a reasonable doubt because of Christina Miano's identification testimony.[12]

The majority relies on *State* v. *Gordon*, 185 Conn. 402, 420, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982), for the proposition that our Supreme Court has "emphatically rejected the notion that the doctrine of harmless error is available to uphold a conviction in which the trial court admitted unnecessarily suggestive and unreliable witness identification testimony." The majority's conclusion that *Gordon* has any vitality is tenuous in light of subsequent case law.

As a preliminary matter, *Gordon* is clearly distinguishable on its facts because it was a case in which the victim was the *only* person who identified the *anonymous* assailant. *State* v. *Gordon*, supra, 185 Conn. 421. Here, there was another eyewitness, Miano, who knew the defendant and clearly identified him not only as the

---

place approximately eight months after the crime. Our Supreme Court has held identifications made ten months after the crime to be reliable." Id.

[12] Although I recognize that I need not address the issue of harmlessness in light of my conclusion that the victim's identifications properly were admitted, I nonetheless choose to express my view on this topic because it presents an alternate ground for affirming the judgment of the trial court.

individual engaged in the one-on-one altercation with the victim but also as one of the individuals engaged in the subsequent three-on-one altercation.[13] See *State v. Monteeth*, 208 Conn. 202, 217 n.1, 544 A.2d 1199 (1988) (*Healey, J.*, concurring) ("I am aware that *State v. Gordon* [supra, 420] . . . holds that harmless error analysis is not used 'whenever the erroneous admission of an unnecessarily suggestive and unreliable identification has violated a defendant's constitutional rights.' That case, however, concerned an unreliable identification by the victim, who was the *sole* source of identification evidence. Here, the unreliable identification is to be considered in the light of the untainted and reliable information by . . . another eyewitness who had a better opportunity to view the defendant during the robbery and made the initial identification." [Emphasis in original.]).

On a more fundamental level, since it was decided, *Gordon* has *never once* been applied to reverse a conviction, much less a conviction involving an assailant known by one of the witnesses. Just six years and seven months after *Gordon* was decided, our Supreme Court in *State v. Milner*, 206 Conn. 512, 536 n.11, 539 A.2d 80 (1988), apparently recognizing that *Gordon* was an outlier, effectively overruled *Gordon* without explicitly stating so: "Even if we assume, arguendo, that the [witness] identification resulted from unnecessarily suggestive procedures and the defendant was able to demonstrate the identification was also unreliable, *we would, nevertheless, find the erroneous admission of [the witness'] identification testimony to constitute harmless error beyond a reasonable doubt in light of the extensive identification evidence otherwise presented that we have previously outlined in detail.* See

---

[13] The trial court found that the police built their case on the information furnished by Miano. I also note, as discussed herein, that while Miano unambiguously identified the defendant as one of the individuals engaged in the three-on-one altercation while the victim was on the ground, the

*Rose* v. *Clark*, 478 U.S. 570, 578–79, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); *Moore* v. *Illinois*, 434 U.S. 220, 232, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977), on remand, 577 F.2d 411 (7th Cir. 1978), cert. denied, 440 U.S. 919, 99 S. Ct. 1242, 59 L. Ed. 2d 471 (1979); *Gilbert* v. *California*, 388 U.S. 263, 273–74, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); *State* v. *Gordon*, [supra, 185 Conn. 420–21]; *State* v. *Packard*, 184 Conn. 258, 269 n.5, 439 A.2d 983 (1981); *State* v. *Oliver*, 161 Conn. 348, 357, 288 A.2d 81 (1971)." (Emphasis added.) *State* v. *Milner*, supra, 536 n.11;[14] see also *Manson* v. *Brathwaite*, supra, 432 U.S. 118 n.* (Stevens, J., concurring) ("[p]roperly analyzed, however, [other evidence of guilt] would be relevant to a question whether error, if any, in admitting identification testimony was harmless"). Although the court did not explicitly state that it was overruling *Gordon*, that was the clear import of the case.[15]

victim admitted that he could not identify any of the individuals who struck him when he was on the ground.

[14] I respectfully disagree with the majority's contention that this quotation from *Milner* is mere dicta. See *Voris* v. *Molinaro*, 302 Conn. 791, 797 n.6, 31 A.3d 363 (2011) ("[Dicta] includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding of the case. . . . [I]t is not [dicta] [however] when a court . . . intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy . . . . Rather, such action constitutes an act of the court [that] [we] will thereafter recognize as a binding decision." [Internal quotation marks omitted.]).

[15] *Gordon*, well-intentioned though it may have been, essentially has been ignored from the start. Research has failed to locate a single other jurisdiction that follows the rule that harmless error analysis is unavailable when an identification is found to be both unnecessarily suggestive and unreliable. Moreover, application of this rule would lead to absurd results in some cases. For example, imagine a bank robbery case in which the out-of-court identification made by a teller is unnecessarily suggestive and unreliable but is admitted at trial. The bank robber is clearly depicted on videotape; he is found outside the bank in possession of marked bills; his mother testifies that he admitted to her that he robbed the bank; five independent witnesses who were inside the bank identify him and he confesses on television. Under *Gordon*, harmless error analysis would not be available following a conviction of the bank robber, and this court would be required to reverse the conviction.

Interestingly, *Gordon* is one of the cases cited by the court in *Milner* in the previous quotation. See *State* v. *Milner*, supra, 206 Conn. 536 n.11. The court in *Milner* cited the pages on which the *Gordon* court applied the harmless error rule despite its holding, earlier in that decision, that harmless error analysis is never available when an unnecessarily suggestive and unreliable identification has been admitted. Id., citing *State* v. *Gordon*, supra, 185 Conn. 420–21. The court in *Gordon* explained that the erroneous admission of the identifications would not have been harmless in any event because they came from "the only eyewitness to the crime . . . ." *State* v. *Gordon*, supra, 421. Therefore, the court in *Milner* appears to have been distinguishing the facts of that case from those in *Gordon*, concluding in effect that the broad rule in *Gordon* is not applicable when other identification evidence has been presented. See *State* v. *Milner*, supra, 536 n.11.

The majority notes that *Gordon* was cited approvingly in *State* v. *Perez*, 198 Conn. 68, 72 n.3, 502 A.2d 368 (1985), but fails to note that *Perez* was decided three years prior to *Milner*. The majority also notes, correctly, that *Gordon* was cited in *State* v. *Patterson*, 31 Conn. App. 278, 300, 624 A.2d 1146 (1993), rev'd, 230 Conn. 385, 645 A.2d 535 (1994). In that case, *Gordon* was cited as an example of a case in which "some constitutional rights [were held to be] so basic and so fundamental that their breach can never be deemed harmless." Id. In *Patterson*, however, this court did not address identification evidence and, thus, did not *apply Gordon's* holding.

Moreover, the legal landscape supporting the premise of the *Gordon* holding—that, when a defendant's constitutional rights have been violated, harmless error analysis is the exception to the general rule, only to be used "sparingly, in a few, discrete circumstances"; *State* v.

*Gordon,* supra, 185 Conn. 419—has changed substantially since *Gordon* was decided. As our Supreme Court explained in *State* v. *Jenkins,* 271 Conn. 165, 856 A.2d 383 (2004): "It is well settled that most improprieties, even those of constitutional magnitude, can be harmless and, therefore, do not require the reversal of a defendant's conviction. . . . [T]he appellate harmless error doctrine is rooted in that fundamental purpose of our criminal justice system—to convict the guilty and acquit the innocent. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. . . . Accordingly, we forgo harmless error analysis *only in rare instances involving a structural defect* of constitutional magnitude. . . . Structural defect cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . *Arizona* v. *Fulminante,* [499 U.S. 279, 309–10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)]. These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. [Id., 310]. Such errors infect the entire trial process, *Brecht* v. *Abrahamson,* [507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)], and necessarily render a trial fundamentally unfair, [*Rose* v. *Clark,* supra, 478 U.S. 577]. Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for [the] determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair. . . . *Neder* v. *United States,* [527 U.S. 1, 8–9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)]." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Jenkins,* supra, 186–87.

As explained in *State* v. *Lopez,* 271 Conn. 724, 733, 859 A.2d 898 (2004): "[T]he [United States] Supreme Court has noted that there is a 'very limited class of cases' involving error that is 'structural,' that is to say, error that transcends the criminal process. *Johnson* v. *United States,* 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), citing *Sullivan* v. *Louisiana,* 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (defective reasonable doubt instruction); *Vasquez* v. *Hillery,* 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (racial discrimination in selection of grand jury); *Waller* v. *Georgia,* 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (denial of public trial); *McKaskle* v. *Wiggins,* 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (denial of self-representation at trial); *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (complete denial of counsel); *Tumey* v. *Ohio,* 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (biased trial judge)."

Therefore, the statement in *State* v. *Gordon,* supra, 185 Conn. 419, that Connecticut appellate courts "sometimes apply the 'harmless error' exception, but only sparingly, in a few, discrete circumstances," lacks viability. Instead, in deciding whether harmless error analysis applies, Connecticut appellate courts determine whether the constitutional violation constitutes the rare case in which "[a] structural error creates a defect in the trial mechanism such that . . . it remains abundantly clear that the trial process was flawed significantly." *State* v. *Lopez,* supra, 271 Conn. 739; see also *State* v. *Morales,* 121 Conn. App. 767, 772, 996 A.2d 1206, cert. denied, 298 Conn. 909, 4 A.3d 835 (2010); *State* v. *Zapata,* 119 Conn. App. 660, 684–85, 989 A.2d 626, cert. denied, 296 Conn. 906, 992 A.2d 1136 (2010); *State* v. *Stuart,* 113 Conn. App. 541, 550–52, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009). The admission of the victim's identifications of the defendant, which the majority finds to have been error,

was not a "structural defect affecting the framework within which the trial proceeds"; *Arizona* v. *Fulminante*, supra, 499 U.S. 310; but, rather, was an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Id., 307–308. In light of *Milner*, and because the premise underlying the rationale in *Gordon* has been vitiated,[16] I conclude that harmless error analysis is available in this case.

Applying the harmless error doctrine to this case, and conceding that the state's burden is a heavy one, I conclude nonetheless that any error in admitting the victim's identification was harmless beyond a reasonable doubt. The following standard of review governs this issue. "The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 306–307, 25 A.3d 648 (2011). "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not

---

[16] The majority dismisses the fact that Connecticut appellate courts "forgo harmless error analysis only in rare instances involving a structural defect of constitutional magnitude"; *State* v. *Jenkins*, supra, 271 Conn. 187; on the ground that *"Gordon* does not rest on constitutional principles, but, rather, it is based on policy." Whether *Gordon's* holding is viewed as resting on a constitutional principle or on judicial policy, one of the premises underlying its rationale—the availability of harmless error analysis to constitutional violations "only sparingly, in a few, discrete circumstances"; *State* v. *Gordon*, supra, 185 Conn. 419—is no longer an accurate statement of the law, thus calling *Gordon's* holding into doubt, especially in light of *State* v. *Milner*, supra, 206 Conn. 536 n.11.

contribute to the verdict obtained." (Internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 252, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Ramirez*, 79 Conn. App. 572, 587, 830 A.2d 1165, cert. denied, 267 Conn. 902, 838 A.2d 211, 212 (2003).

My conclusion that the admission of the victim's identification was harmless is grounded in the fact that the jury heard testimony from Miano, an eyewitness who knew all of the parties involved in the incident and spent a significant amount of time with the defendant on the night in question. Miano provided the following relevant testimony. On the night in question, she traveled with her then boyfriend, Robert Acevedo; Robert's sister, Anna Acevedo; and the defendant, who was Anna Acevedo's boyfriend at the time. The four rode in Robert Acevedo's silver Infiniti automobile to Club NV. While inside Club NV, Miano briefly visited with the victim, who was good friends with the father of Miano's children. After Robert Acevedo attempted to hit the victim with his automobile in retaliation for speaking with Miano, the defendant exited the automobile[17] and began

---

[17] The majority states that Miano "was unsure whether the defendant had gotten into the motor vehicle before the altercation." Miano testified that she thought the defendant, who, up until that point was missing, opened the automobile door, never fully sat down, and then exited the automobile.

pushing the victim. Soon thereafter, Anna Acevedo and Robert Acevedo exited the automobile, and the victim was on the ground. Miano saw Anna Acevedo, Robert Acevedo, and the defendant fighting with the victim while the victim was on the ground.[18] Miano eventually exited the automobile and attempted to help the victim by pulling Anna Acevedo off of him. The defendant was "right there" when Miano did this. As two police officers arrived to break up the fight, "they all got off [the victim at] the same time."

Although, as the majority points out, Miano's testimony is less than clear as to exactly what occurred during the attack, she unhesitatingly identified the defendant as the individual engaged in the one-on-one altercation with the victim, testifying that she did not have any doubts that the defendant was the first person out of the automobile confronting the victim. She also clearly identified the defendant as one of the three individuals "around" the defendant when he was on the ground.

The defendant was *not* convicted of stabbing the victim, as the court granted the defendant's motion for a judgment of acquittal as to the charge of assault in the first degree while aided by two or more persons. The defendant was convicted only of *accessory to assault in the first degree by means of a dangerous instrument.*[19] As explained in part I of the majority opinion, to obtain a conviction for this crime, "the state was not required to prove that the defendant intended to cause serious

---

[18] Miano did pull back from this statement at various times, testifying that while the victim was on the ground, Anna Acevedo, Robert Acevedo, and the defendant were "around him" but that she did not know exactly what they were doing. Later in her testimony, however, Miano testified that she did not have any doubts that Anna Acevedo and Robert Acevedo joined the altercation.

[19] The jury found the defendant not guilty of conspiracy to commit assault in the first degree while aided by two or more persons and conspiracy to commit assault in the first degree with a dangerous instrument.

physical injury *by means of a dangerous instrument,* or to prove that the defendant was even aware that another participant had a dangerous instrument or knife." (Emphasis in original.) Rather, it was sufficient for the state to prove that the defendant intended to aid the principal in causing the victim serious physical injury and that the principal used a dangerous instrument.

Thus, at the least, the jury could have inferred on the basis of the testimony of the victim and Miano that the defendant struck the victim while he was on the ground, that the defendant intended to aid Robert Acevedo or Anna Acevedo in causing serious physical injury to the victim, and that Robert Acevedo or Anna Acevedo used a dangerous instrument to cause the serious physical injury. The victim testified, however, that he had no idea who stabbed him or who was hitting him after he was on the ground.[20] He merely testified that, because he was hit from different angles at the same time, he believed that three or four people assaulted him while he was on the ground and shielding his head. Therefore, even if the victim's identification of the defendant had not been admitted, it seems clear that the jury still would have reached the same conclusion—that the defendant struck the victim with the requisite intent while he was on the ground—on the basis of Miano's testimony and the victim's untainted testimony.

---

[20] Defense counsel conducted the following cross-examination of the victim:

"Q. And you testified the other day that after this unknown party interjected themselves in, now, a second altercation, you never saw the passenger hit you again, did you?

"A. No.

"Q. You don't—in fact, you don't know what the passenger did after this unknown person interjected themselves in the altercation, do you?

"A. Correct.

"Q. For all you know, that person could have left the scene.

"A. Yes, sir."

Because the defendant was convicted for his participation in the three-on-one altercation, and the victim could not identify any of the individuals involved in *that* altercation, the jury must have believed Miano's testimony. Simply put, in light of the other evidence, the victim's identification of the defendant as the assailant in the one-on-one altercation provided only incidental support for the defendant's conviction. See *State* v. *Dupigney*, 78 Conn. App. 111, 121, 826 A.2d 241 (witness identification "added little to the evidence before the jury"), cert. denied, 266 Conn. 919, 837 A.2d 801 (2003).

Finally, I underscore that this is not a case in which the victim was the only witness to identify an unknown assailant. It also is not a case in which a witness obtained a fleeting glance of an anonymous bank robber. See *State* v. *Ledbetter*, supra, 275 Conn. 553 ("[w]e have said of identification that a good hard look will pass muster even if it occurs during a fleeting glance" [internal quotation marks omitted]). Miano was not merely a member of the public who witnessed the assault. She was a social acquaintance of the defendant,[21] she arrived at the crime scene with the defendant, and she left the crime scene with him after the attack. As the finder of fact, the jury is the arbiter of credibility; *State* v. *Fleming*, 111 Conn. App. 337, 345, 958 A.2d 1271 (2008), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009); and, apparently, the jury found Miano credible in light of the victim's testimony that he could not identify any of the individuals who struck him while he was on the ground.[22] The defendant had the full

---

[21] Miano testified that she had known the defendant for at least one month prior to the incident and that she "hung out with" him along with Robert Acevedo and Anna Acevedo.

[22] The majority asserts that Miano's "familiarity with [the victim] together with her relationship with Robert Acevedo reasonably could have put her objectivity in doubt for the fact finders." Contrary to this speculation that Miano may have been biased in favor of the victim, the jury, in fact, heard evidence indicating that Miano may have been motivated to minimize the inculpatory nature of her testimony. Miano testified that she did not want to be involved in the case because she feared her family would face retaliation in

opportunity to explore any weaknesses in Miano's testimony at trial. "Any uncertainty on the witness' part goes toward the weight of the evidence rather than the admissibility." *State* v. *Figueroa*, supra, 235 Conn. 159. Notwithstanding legitimate concerns about eyewitness identification procedures generally and the nettlesome aspects of this case, the reality is that many of these concerns dissipate in cases in which a witness identifies a perpetrator known to him or her.

In light of the likely impact of the victim's identification and the result of the trial, I believe that any error did not contribute to the verdict. Accordingly, even assuming the identification was unreliable and should not have been admitted, I would find such error harmless.

I would affirm the judgment of the trial court.

response to her cooperation. The majority also emphasizes Miano's testimony that she was "tipsy" on the night of the incident. Miano explained, however, that she had no trouble walking, could see clearly, and could hear fine.